**Warren H. GARRETT, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 57628.

Court of Criminal Appeals of Texas,
Panel No. 1.

May 20, 1981.

Rehearing Denied Nov. 17, 1982.

Ronald L. Goranson, Dallas, court appointed on appeal only, for appellant.

Henry Wade, Dist. Atty. and W.T. Westmoreland, Jr., Jon Sparling and Jerry Banks, Asst. Dist. Attys., Dallas, and Robert Huttash, State's Atty., Austin, for the State.

Before ONION, P.J., and ROBERTS and CLINTON, JJ.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for criminal solicitation. V.T.C.A., Penal Code, § 15.03.[1] Punishment, enhanced by a prior burglary conviction alleged and proven, was assessed by the jury at sixty (60) years' imprisonment.

Appellant advances a number of grounds of error, but we are confronted at the outset with grounds of error contending the trial court erred in permitting the prosecu-

---

1. V.T.C.A., Penal Code, § 15.03 (Criminal Solicitation), provides:

"(a) A person commits an offense if, with intent that a capital felony or felony of the first degree be committed, he requests, commands, or attempts to induce another to engage in specific conduct that, under the circumstances surrounding his conduct as the actor believes them to be, would constitute the felony or make the other a party to its commission.

"(b) A person may not be convicted under this section on the uncorroborated testimony of the person allegedly solicited and unless the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the actor's intent that the other person act on the solicitation.

"(c) It is no defense to prosecution under this section that:

"(1) the person solicited is not criminally responsible for the felony solicited;

"(2) the person solicited has been acquitted, has not been prosecuted or convicted, has been convicted of a different offense or of a different type or class of offense, or is immune from prosecution;

"(3) the actor belongs to a class of persons that by definition of the felony solicited is legally incapable of committing the offense in an individual capacity; or

"(4) the felony solicited was actually committed.

"(c) An offense under this section is:

"(1) a felony of the first degree if the offense solicited is a capital offense; or

"(2) a felony of the second degree if the offense solicited is a felony of the first degree."

tion, over timely objection, to introduce hearsay testimony on a crucial issue.

The State's evidence reflects William E. Waggoner, undercover agent for United States Customs, received information from informers that there were some contraband machine guns or other automatic weapons for sale in the Dallas area and they could soon be enroute to Mexico. He was introduced to Chuck Prestridge by a state assistant district attorney sometime in June, 1975. Prestridge was a professional informer, a "street character" and an acknowledged bounty hunter. It was agreed that Prestridge would get a percentage on any illegal weapons recovered.

Although Waggoner had no information that the appellant Garrett was involved with guns, Waggoner gave Garrett's name and that of another man to Prestridge. Prestridge then set about trying to locate some underworld characters who would arrange an introduction to Garrett. He was unsuccessful. He then began to contact Garrett directly at one of the two Adult Book Stores operated by Garrett. He finally made contact. Prestridge told Garrett he was a pimp and acting as a middleman in a hoped for gun transaction. Garrett told Prestridge that he knew nothing about the weapons he sought, but that he once had an employee at one of his stores who had remarked that he had a friend who dealt in guns. Garrett promised to make inquiries. There were several other conversations and meetings between Garrett and Prestridge. Garrett was unable to contact his former employee, but told Prestridge he had learned of 100 M–16 rifles in the Little Rock area, but fifty had already been sold.[2] Garrett was arrested for some charge and placed in jail. On July 30, 1975, Waggoner went to see Director D.L. Burgess of the Dallas Police Department to secure Garrett's release so that the gun deal could continue to develop. When they checked, however, they found Garrett had already been released.

Subsequently an agreement was reached between Prestridge and Garrett to meet at Campisi's restaurant on the night of July 31, 1975. Prestridge and Waggoner went to the restaurant, but Garrett was late. When he arrived, he was with Susan Gayle Jones, a prostitute with whom he was living while separated from his wife, and who was also an employee at one of Garrett's stores.[3]

Waggoner was introduced to Garrett as Bob Story, the money man, who represented interests in Mexico who were anxious to acquire the weapons and they were upset about the delays in securing the same. Garrett was pressed for developments in the gun deal. Garrett explained he had tried to contact the man in Little Rock, but he had been constantly harassed by the Dallas police, who had been in and out of his stores, and he had been arrested numerous times. When asked by Waggoner why he was late, Garrett explained that Lt. Mel Southall, the source of most of his trouble, had, shortly before the restaurant meeting, confiscated a shotgun at one of his stores claiming it to be an illegal sawed-off shotgun. When, according to Waggoner, he inquired why Southall was harassing him, Garrett replied that word had gotten out on the street sometime earlier that a "contract" had been put out on Southall and the rumor was that he (Garrett) was involved. Waggoner acknowledged he told Garrett, "We don't put up with that kind of thing down where we come from (Laredo)." Waggoner related Garrett inquired if he (Waggoner or Story) had anyone down there (Mexico) that could handle a contract. Waggoner promised to check into the matter.

Waggoner testified that he considered the offense of criminal solicitation completed on the night of July 31st. The next morning Waggoner reported his conversation with Garrett to Director Burgess.

In its case-in-chief the State then called Burgess, who related that he had been visit-

---

2. This apparently was not true but was told to Prestridge to keep the dialogue going.

3. Jones testified she came along because Prestridge had told her he wanted her to go to Houston to engage in prostitution for him in order to make some money.

ed by Waggoner, and the conversation between Waggoner and Garrett on July 31st had been related to him, and on direct examination he was asked about the conversation at which he was not present:

"Q. Okay, can you tell us what the conversation was that took place there?

"A. Yes.

"MR. RICHARD BANKS (Defense Counsel): We object to that hearsay, Your Honor.

"THE COURT: Overruled.

"THE WITNESS: One of the things that they did—they related to me a meeting that they had had earlier, on the night before, rather, with Mr. Garrett.

"Q. (BY MR. SPARLING) (Prosecutor): All right.

"A. And the conversation that they had had with him, and part of the conversation was the fact that Mr. Garrett had—

MR. RICHARD BANKS: Again, we have to object to this as hearsay.

"THE COURT: Overruled.

"THE WITNESS: Mr. Garrett had made a threat on the life of a Dallas policeman."

Burgess indicated he knew who the officer was and that the officer was in his department.

Appellant's counsel repeatedly objected that the conversation being related was hearsay, was being asserted for the truth of the matter and asked for a running objection. All objections were overruled. Then the prosecutor continued his interrogation:

"Q. The question is: What was the substance of the conversation between you and Bill Waggoner that revealed to you that one of your supervisors (sic) was threatened?

"A. He told me that when he had met with him that this man was in a sense enraged about an instance that had occurred prior to the meeting, and told

me that he would give anything in the world, I believe was his words, to have this man killed. He said he come down and took his shotgun.

"And I knew the officer was talking about Lieutenant Southall. He had some problems, Waggoner did, between Westfall, who was one of the lieutenants at that time, and Southall, as far as the names were concerned; but when he related the shotgun incident, I knew who the officer was who he was talking about, and I told him so . . . ."[4]

Garrett, 28 years old, testified about his prior criminal record, his operation of adult book stores, etc., his past difficulties with Southall and about being contacted by Prestridge. He stated he made an effort to contact his former employee and to learn information about any illegal weapons about which he knew nothing, but he was unsuccessful. Nevertheless, he told Prestridge he had located fifty rifles. Describing Prestridge, he stated, ". . . You know the guy with a funny gold earring, he didn't strike me as a pimp in the first place. He was driving a '67 Chevrolet, and he was feeding me all this big line about the people he knows, and I don't know, I just felt like he was blowing smoke at me, so I blew some back at him."

Recalling the meeting at Campisi's, Garrett said Waggoner was introduced to him as "Bob Story," the man with the money. He said Waggoner and Prestridge pressed him on the gun situation, and inquired why he was late for the arranged meeting. He told of his past difficulties with Southall though he had denied he had been involved in any "contract" on Southall and related the confiscation of his shotgun by Southall that night. Garrett stated Prestridge replied, "Garrett, you know, if you're going to stay alive in business, something's got to be done, you know." Garrett stated he turned to Story (Waggoner) and asked what he would do and Waggoner replied, "Well, I don't know what you all do up here in

4. Burgess related that Southall had measured the shotgun taken from Garrett and found it was legal and had to return it to Garrett.

Dallas, but down in Laredo, we wouldn't put up with this shit. We would do something about it and fast." Garrett stated Waggoner mentioned they had some Mexicans across the border who would do anything to anybody, and left the impression the Mexicans were working for him. Garrett testified he told Waggoner that if anything happened to Southall he would be the first one the police would approach, and that then the subject returned to guns. He left the meeting thinking Waggoner was a joke, a squirrel and that Prestridge was not what he said he was.

Garrett related how he tried to avoid Waggoner's and Prestridge's telephone calls on August 1st and 2nd. They appeared about 6 or 6:30 p.m. on August 3rd at the motel, offered him a napkin of Preludine tablets and inquired about the guns. As a result of his suspicions and because they were bugging him, Garrett told them the "Black Berets" (a made-up organization) had bought the remaining fifty guns and "they" were out of business.

Waggoner then brought up the Southall matter in which Garrett disclaimed any interest. Waggoner told him he had Mexicans who would kill Southall any way desired, if the Mexicans had $250.00 "up front" for traveling expenses and would receive $5,000.00 for which they would go back to Mexico and wait. They would do it on credit, but wouldn't do it if they knew the victim was a police officer. Garrett explained he was flat broke. Waggoner stated he knew people in Houston who had adult book stores if Garrett had anything to sell. Garrett said he had three prints of "Deep Throat" and one print of "The Devil and Miss Jones." Waggoner urged Garrett to pick up these films from those to whom he had loaned them so he could sell them in Houston to raise the $250.00. Garrett stated he told Waggoner he would do so, but did not intend to do so, and never did.

On August 5, 1975, Waggoner called Garrett about the films and Garrett asked for more time. At 4 p.m. on said date, Garrett was stopped by Waggoner as he was departing one of his stores. Waggoner pressed him for the films and stated they had to get the deal on Southall "going." Garrett gave Waggoner two 8 mm films of the value of about $17.95 each, and when asked about a description of Southall, gave Waggoner one including "Lieutenant, Vice Control" because Waggoner's supposed assassins would not deal with a police officer victim. Waggoner told him he would be back at 9 p.m. for the other films. Garrett told him he wouldn't be there and would say his truck had broken down. Garrett testified at no time had he any intention of having Southall killed. He stated he would get out of the business or put up with Southall before having that occur.

Without relating all the details of both the State's and appellant's theories, the State's case shows that Waggoner, a United States customs agent, acting undercover, attempting to discover evidence as to contraband weapons, testified that at their meeting at Campisi's on July 31, 1975 appellant committed the offense of criminal solicitation. On the other hand, appellant contends that when he explained why he was late to their meeting after being pressed for an explanation and why there was a delay in reporting on any contraband weapons, it was Waggoner who suggested that Southall be disposed of. That this matter was pursued again on August 3, 1975 by Waggoner, and that he played along to get out of a bad situation, that he had no intention of getting rid of Southall.

There was a sharp conflict between the State and defense testimony. The State's theory was that Garrett initiated the conversation on July 31st and solicited Waggoner to set up a "hit contract" on Southall. The defense theory was that Waggoner asked for an excuse for Garrett's tardy arrival for the meeting on guns on July 31st, that Garrett explained, and Waggoner and Prestridge first suggested that something be done to Southall and Waggoner offered to make inquiries about possible assassins. Garrett denied he ever had any intention to be involved in any scheme to kill Southall. The importance of the conversation on July 31st is apparent.

The State, however, was allowed over objection that the same was hearsay and was being asserted for the truth of the matter, to elicit from Director Burgess of the Dallas Police Department what Waggoner told him the next morning about the conversation of July 31st at which Burgess was not present. Burgess' testimony thus was permitted to bolster Waggoner's version of the conversation and the State's theory of the case.

In *Salas v. State,* 403 S.W.2d 440 (Tex.Cr. App.1966), this court held that hearsay evidence is that which a given witness offers in court which is not based on his own knowledge but is merely a repetition of what he has been told, and which is offered as proof of the matter contained or stated therein. See also *Irvin v. State,* 563 S.W.2d 920 (Tex.Cr.App.1978); *Ex parte Martinez,* 530 S.W.2d 578 (Tex.Cr.App.1975).

In *Salas v. State,* supra, a police officer testified as to the contents of a conversation that came to him, not through his personal observations or knowledge, but from another person. The conviction for unlawfully carrying a pistol was reversed. In the instant case Burgess' testimony constituted hearsay and was offered as truth of the matter asserted. However, while such testimony was inadmissible hearsay, before the improper admission of hearsay presents reversible error such testimony must be shown to be prejudicial. *Dalton v. State,* 516 S.W.2d 937 (Tex.Cr.App.1974); *Fuller v. State,* 501 S.W.2d 112 (Tex.Cr.App. 1973); and *Haynes v. State,* 482 S.W.2d 191 (Tex.Cr.App.1972).

Since there was a conflict in Waggoner's testimony and that of appellant as to whose idea it was to kill officer Southall, appellant maintains that Burgess' testimony served no purpose other than to bolster, through the use of inadmissible hearsay, the testimony of Waggoner, the State's principal witness.

The testimony of Burgess as to Waggoner's revelation of the conversation of July 31st was hearsay, offered for the truth of the matter, served to bolster Waggoner's version of the conversation and the State's theory of the case. Such testimony was clearly prejudicial and calls for reversal.[5]

The judgment is reversed and remanded.

---

5. We observe that Burgess was also allowed to testify, over objection, to Southall's version of a conversation with the appellant at which he (Burgess) was not present which Southall had related to him. In view of other testimony offered, this might not present reversible error. It is mentioned because of the bulk of hearsay testimony offered.