**Bobbie Ruth URICK, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 68802.**

Court of Criminal Appeals of Texas, En Banc.

Dec. 21, 1983.

Rehearing Denied Jan. 25, 1984.

Jim Vollers, Austin, for appellant.

James S. McGrath, Dist. Atty. and R.W. Fisher, Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty., Austin, for the State.

OPINION

ODOM, Judge.

This is an appeal from a conviction by a jury for delivery of ethchlorvynol, a controlled substance. The trial court assessed punishment at 10 years. The sufficiency of the evidence is not challenged.

---

In her first ground of error appellant alleges that the trial court committed reversible error by allowing a police officer to repeat statements made by an undercover officer involved in the case concerning two separate purchases of controlled substances from appellant. Appellant denied selling any controlled substances to the undercover officer.

During the trial the undercover officer testified that he had filed several reports concerning different cases on the evening in question and that the times as stated in the reports were in conflict with each other. The deputy sheriff who received the evidence from the undercover officer testified on redirect during the trial as follows:

"Q. Now, you previously testified that concerning your ability to recall the fact in this particular case and what have you that there was something unusual about the Ruth Urich case at the time that you became familiar with it back on October 17th that caused it to stick in your mind. Tell the jury what that unusual thing is that caused the Urich case to stick out and be a little different than other cases?

"A. Yes, sir. Earlier that day of the 17th I had been informed by Deputy Vickery—

"MR. DOYLE: I am going to object at this time. What Deputy Vickery told him would be hearsay.

"THE COURT: Any response.

"MR. HOLMES: Yes, sir. It is not going to be hearsay cause I am not going to offer what he said as true. His memory was challenged and asked how he could remember a specific case. I am not offering to tell the jury what he is about to say is true. He was told that and that clicked in his mind and what made this case unusual.

"THE COURT: Overrule the objection.

"Q. Tell us what you heard that made this case different than the run of the mill case that was going down at that time?

"A. Well, Deputy Vickery advised that he had been told by Dennis Sheffield—

"MR. DOYLE: I raise another objection.

"THE COURT: Yes, sir.

"MR. DOYLE: It appears not going to be something that Mr. Vickery told him which would be hearsay. He is now going to say what Mr. Sheffield told Mr. Vickery. Mr. Vickery was a witness in this case but the State has not chosen to put Mr. Sheffield on the stand and not a witness in this case. I will never have an opportunity to cross examine—

"MR. HOLMES: He would if he had issued his subpoena.

"THE COURT: Are you offering it for the truth?

"MR. HOLMES: No, sir, not offering it for the truth.

"THE COURT: Overrule the objection.

"A. I had been so informed by Deputy Vickery that they would be making a buy or he would be making a buy that night through the use of Dennis Sheffield and that he was going to utilize the service of Detective Nicholson as surveillance officer. That he would be buying from a woman or girl by the name of Kathy Urich in Port Arthur.

"At that time is when he requested that I would meet him in Mid County to receive the evidence after this case would go down somewhere in the vicinity of 6:00 is when it was originally set up. In that time frame.

"That they would be doing other cases that night.

"So I agreed to meet with him at the Mid County office. When he came in at about 7:15 he said we have got two of them.

"I said what do you mean.

"We have got a mother-daughter combination.

"That was the only mother-daughter combination that we made throughout the whole drug operation. That is the only mother that sold and the only daughter that sold in pairs.

"And I remembered that night. When he came in at 7:15 that was the first time

that I had seen him and I do know that was the Urich case cause we talked about it.

"At that time he wanted to know whether or not he should go further and make other buys from the Urichs if that was possible.

"In other words, he needed an okay from me cause there was talk of black mollies being sold, biphetamine 20. We had run into problems and losses of biphetamine being fake. Biphetamine were dumped out and caffeine placed in it.

"We discussed whether or not these people were actually supplying good black mollies and could.

"He so stated that he felt she was supplying good narcotics. That she had stated that she got them from her doctor or a doctor.

"And I gave him the okay to go ahead and make other buys if it was possible. For that reason I remember this particular date. I remember this was about 7:15 as I was a little bit concerned about the undercover agents coming into that area when it wasn't really quite dark with the traffic around the airport.

"Later that night closer to 9:00 I got the second case."

The State argues that the admission of the deputy's testimony was admissible because it merely stated the grounds for his recollection of the events on the evening of October 17, 1978. The deputy remembered the case in particular because it was the only mother and daughter case they had made. While relating this recollection, however, the deputy testified to numerous hearsay statements made by other individuals.

In *Salas v. State*, 403 S.W.2d 440, 441, this Court held that hearsay evidence is that which a given witness offers in court which is not based on his own knowledge but is merely a repetition of what he has been told, and which is offered as proof of the matter contained or stated therein. See also *Irvin v. State*, 563 S.W.2d 920, 925. Before improper admission of hearsay

presents reversible error, however, such testimony must be shown to be prejudicial to the defendant. *Garrett v. State*, 641 S.W.2d 232, 236. The testimony of the deputy was clearly prejudicial to appellant in the present case. Appellant properly objected to the testimony and was overruled by the trial court. The State offered the testimony under the guise that it was not offered to assert the truth of the matters contained therein, which was clearly not the case.

The undercover officer was the sole witness to the alleged sale by appellant of the controlled substances. Appellant took the stand in her own behalf and denied that she had ever sold pills to the undercover officer or anyone else. Appellant alleged that the informant, Dennis Sheffield, had stolen the pills out of her purse while he was in her apartment on October 17, 1978. The State clearly attempted to bolster the testimony of the undercover officer by allowing the deputy to testify regarding any statement made to him on the night of October 17, 1978. Thus, the most basic reason for excluding the out of court statements of third parties was violated. See *Barber v. State*, 481 S.W.2d 812, 814. The purpose of the deputy's testimony could serve no other purpose than to bolster the testimony of the undercover officer, the sole witness to the alleged offense. Such testimony was prejudicial and calls for reversal. *Garrett v. State*, 641 S.W.2d 232, 236; *Cabrera v. State*, 395 S.W.2d 34.

In view of our disposition made herein, other grounds of error will not be discussed.

The judgment is reversed and the cause remanded.

McCORMICK, Judge, dissenting.

The majority is in error when it reverses this case because hearsay was improperly admitted into evidence.

Deputy David Matlock testified on direct examination that he received bags of evidence from the undercover officers operating in a large scale drug operation on the night of the offense.

The record shows that during his cross-examination of Deputy Matlock the defense attorney questioned the witness as to how he could remember when he received the bag of evidence for this particular case from undercover officer Joe Vickery:

"Q. So some ten months later when you tell these twelve people that you got this envelope at 7:15 p.m. on the 17th of October what you are relying on is information that was given to you by Vickery or someone or some other person back ten months ago?

"A. Not totally, no, sir. But partially.

"Q. Well, you don't remember what time you got this stuff?

"A. I can remember basically within an approximate framework.

"Q. On a hundred cases?

"A. Most of the cases, yes, sir. By either looking at the bag—

"Q. Well, when you look at the bag it has your notations that you made from Mr. Vickery?

"A. Well, I would know within a reasonable time whether that was accurate or not accurate. I know, I can remember this particular case cause of some details that they told me.

"Q. Who told you?

"A. That Deputy Vickery told me related to them.

"Q. When?

"A. The 17th of October."

On redirect, the prosecutor asked the witness to elaborate on what he had told defense counsel about his ability to recall the instant case:

"Q. Now, you previously testified that concerning your ability to recall the fact in this particular case and what have you that there was something unusual about the Ruth Urich case at the time that you became familiar with it back on October 17th that caused it to stick in your mind. Tell the jury what that unusual thing is that caused the Urich case to stick out and be a little different than other cases?

"A. Yes, sir. Earlier that day of the 17th I had been informed by Deputy Vickery—

"MR. DOYLE: I am going to object at this time. What Deputy Vickery told him would be hearsay.

"THE COURT: Any response.

"MR. HOLMES: Yes, sir. It is not going to be hearsay cause I am not going to offer what he said as true. His memory was challenged and asked how he could remember a specific case. I am not offering to tell the jury what he is about to say is true. He was told that and that clicked in his mind and what made this case unusual.

"THE COURT: Overrule the objection.

"Q. Tell us what you heard that made this case different than the run of the mill case that was going down at that time?

"A. Well, Deputy Vickery advised that he had been told by Dennis Sheffield—

"MR. DOYLE: I raise another objection.

"THE COURT: Yes, sir.

"MR. DOYLE: It appears not going to be something that Mr. Vickery told him which would be hearsay. He is now going to say what Mr. Sheffield told Mr. Vickery. Mr. Vickery was a witness in this case but the State has not chosen to put Mr. Sheffield on the stand and not a witness in this case. I will never have an opportunity to cross examine—

"MR. HOLMES: He would if he had issued his subpoena.

"THE COURT: Are you offering it for the truth?

"MR. HOLMES: No, sir, not offering it for the truth.

"THE COURT: Overrule the objection.

"A. I had been so informed by Deputy Vickery that they would be making a buy or he would be making a buy that night through the use of Dennis Sheffield and that he was going to utilize the service of Detective Nicholson as surveillance officer. That he would be buying from a woman or girl by the name of Kathy Urich in Port Arthur.

At that time is when he requested that I would meet him in Mid County to receive the evidence after this case would go down somewhere in the vicinity of 6:00 is when it was originally set up. In that time frame.

That they would be doing other cases that night.

So I agreed to meet with him at the Mid County office. When he came in at about 7:15 he said we have got two of them.

I said what do you mean.

We have got a mother-daughter combination.

That was the only mother-daughter combination that we made throughout the whole drug operation. That is the only mother that sold and the only daughter that sold in pairs.

And I remembered that night. When he came in at 7:15 that was the first time that I had seen him and I do know that was the Urich case cause we talked about it.

At that time he wanted to know whether or not he should go further and make other buys from the Urichs if that was possible.

In other words, he needed an okay from me cause there was talk of black mollies being sold, biphetamine 20. We had run into problems and losses of biphetamine being fake. Biphetamine were dumped out and caffeine placed in it.

We discussed whether or not these people were actually supplying good black mollies and could.

He so stated that he felt she was supplying good narcotics. That she had stated that she got them from her doctor or a doctor.

And I gave him the okay to go ahead and make other buys if it was possible. For that reason I remember this particular date. I remember this was about 7:15 as I was a little bit concerned about the undercover agents coming into that area when it wasn't really quite dark with the traffic around the airport.

Later that night closer to 9:00 I got the second case."

It is abundantly clear that Deputy Matlock's testimony did not go to the truth of the matters stated to him by Joe Vickery, but was only offered to explain how Deputy Matlock remembered receiving into his custody the evidence used in the instant case.

"Occasionally a witness may legitimately be allowed to testify as to statements made to him out of court, as the simplest way of identifying the time, place, or occasion, to which the main body of his evidence relates, or otherwise explaining such evidence. For this purpose, the evidence is obviously not hearsay as the statements are not used to prove the matters stated therein." Ray, Law of Evidence (1980) Volume 1A, Section 803, page 62.

This is a textbook case of non-hearsay. Until the majority agrees, I must dissent.

W.C. DAVIS and CAMPBELL, JJ., join in this dissent.