Michael **GOODMAN**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 68927.

Court of Criminal Appeals of Texas, En Banc.

Oct. 2, 1985.

Rehearing Denied Dec. 4, 1985.

Allen C. Isbell, on appeal only, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and Winston E. Cochran, Jr., John Holleman & Ira Jones, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

This is an appeal taken from a conviction of capital murder. V.T.C.A. Penal Code, § 19.03(a)(2). The death penalty was imposed after the jury answered affirmatively the special issues submitted under Art. 37.071, V.A.C.C.P. Appellant presents fourteen grounds of error for review. We affirm the conviction.

In ground of error number eight, appellant contends that the trial court erred in excusing venireman Fausto Nolasco *sua sponte* in that the potential juror was not absolutely disqualified under Art. 35.-16(a)(2), (3), or (4), V.A.C.C.P. During the voir dire examination of venireman Nolasco, the following discussion took place:

"Q. [Prosecutor]: Maybe this question doesn't make much sense, but I've been told, I tried to learn Spanish and I wasn't very good at it, very little. I know they say you really aren't completely fluent in a language until you can think in it. I never could think in Spanish. But at any rate, do you kind of more or less think in Spanish? Do you hear the English—

"A. [Witness]: That's what happened when we came to this country, because especially when I came, I was 28 when I came to this country and I came along real, real—I don't know how to say it, but everything I translate in English, and that's where my problem is.

"Q. So when you are listening to evidence or the questions or the answers that were given, you would be having to translate that into Spanish. I mean that's the way your thought processes work?

"A. Yes, I'm kind of confused.

"Q. And you have been confused in some of the questions I've asked?

"A. No, I don't have confused. I understand mostly.

"Q. Well, you understand that it would be very important for you, as a juror—we have a life or death matter. It would be kind of maybe very critical that someone understands everything instead of just most of it.

"A. I understand.

"Q. And it would be impossible for a juror to say, I'm sorry, Mr. Attorney, I didn't understand what the question was. Could you rephrase it, or I'm sorry, Mr. Witness, I'm sorry, Mr. Attorney, I didn't understand the question, could you rephrase it in such a way, or I'm sorry, Mr. Witness, I didn't understand exactly what you meant, could you say it a different way. Now, Mr. Nolasco, I don't know if that would apply to you, because, like I said, again, I don't know you, but I know I'm having a little trouble with you here and that's probably my problem too. But do you thing [sic] your usage and understanding of the English language would be such that it would keep you from fairly listening to questions and answers and understanding them completely in such a way you could be fair to both sides.? [sic]

"A. I can do both sides, but most of my problem is with the language. I don't think it is your fault. It is my fault, because I don't—I'm aware this is something serious and I don't want to answer something that I don't understand.

"Q. Okay. I'm not sure, my question was, do you think you would be able to sit over here and understand the questions well enough, understand the answers given well enough, knowing you are going to have to pick it up as the questions are asked and answers are given and understand what was said and apply that to the law that the Judge will give you. That's a very important thing, especially when we are talking about the possibility of somebody receiving the death penalty. And you can see that someone who, for the most part, uses another language than English. The proceeding will be in English.

"A. That's true.

"Q. That even though you have a working relationship as far as English is concerned, I understand you can speak English and you understand, and you understand at least most of it, but there could be a point where there is a position where someone who speaks Spanish and thinks in Spanish might not be able to sit over here and perform the functions or duties of a juror in a fair way. And I don't know if that would apply to you or not. Do you think it would?

"A. I don't know what to answer. I don't know. You talk too fast to me.

"Q. I apologize for talking too fast.

"THE COURT: Let me interrupt. Of course, you've been informed there's a

possibility that the defendant in the case could [be] assessed the death penalty. This is the most important type of criminal case that exists. This is a very important case, both to the defendant and to the State.

Now, both the defendant and the State are entitled to 12 jurors that they know can hear and fully understand not just part of the evidence, but all of the evidence.

Can you assure me that [you] are confident that you can understand everything that was said from the witness stand by doctors, policemen, laywitnesses, and others? Do you feel sure that you can understand it all?

"THE JUROR: I'm sure I don't understand everything.

"THE COURT: You are sure you could not understand it all?

"THE JUROR: I understand a lot, but not everything.

"THE COURT: Well, it's necessary that you understand all of it.

"THE JUROR: Yes, sir.

"THE COURT: You don't think you could do that?

"THE JUROR: I don't think I can do that.

"Q. [By Mr. Holleman] You see what I'm saying, or why I would have a concern about having somebody base their decision on the case on just part of the evidence?

"A. No, I don't think I really do. I don't think I understand everything. I don't think I'm going to be able to serve as a juror.

"Q. You honestly don't think you would be able to?

"A. That's true.

"THE COURT: Mr. Nolasco, step out in the hall a moment while I have a private conference with the lawyers.

OUT OF THE PRESENCE OF THE PROSPECTIVE JUROR:

"THE COURT: My inclination is to excuse this juror on the Court's own motion. I don't want to commit reversable [sic] error. I don't believe that he will be capable of fully understanding all of the testimony from the responses he has given here, and he's indicated by his own words that he doesn't believe that he can understand it all.

John, do you think it would be error to excuse him on my own motion?

"MR. HOLLEMAN: No, Your Honor. I think it is clear from his answers and all, and at least to me, and you have the same opportunity to view him and we will move that he be excused for cause. And we were planning on doing that. I just simply don't feel he could fulfill the function of a juror and he's even told us that much.

"MR. TOOMEY: Your Honor, would except and object to the challenge for cause.

"THE COURT: He hasn't challenged him yet.

"MR. TOOMEY: I take exception to the Court's own motion and would like an opportunity to do it official after it is done, because he meets the requirement of the law. He can read and write based upon his own testimony. He filled out the questionnaire and reads *Time* magazine and the newspaper. He has his own business here in the United States. Secondly, the State procedure to this inquiry, after they realized the person had problems with the death penalty issue. And I think it is obvious with the record he passed the Witherspoon test, and they are now going in to try to bolster his inability to read and write the English language. If they were truely [sic] concerned about that, that would have been the first question asked.

We object to him being excused by the Court on his own motion.

"MR. HOLLEMAN: May I respond to the last part?

I think the Record will show that in answer to him attempting to answer some of the questions, it became apparent to me he didn't understand. I think he even said so much, he didn't

understand, and then I went into that area.

"THE COURT: All right, I'm going to excuse him on the Court's own motion, because in a death penalty case, I think it is absolutely essential that every juror have at least the capability of understanding all of the testimony. And I think it would be a dangerous thing to permit anybody to serve on a jury that might not understand at least a portion of the testimony. And I'm convinced this man could not adequately understand it all.

Appellant asserts that the record does not establish that Nolasco was absolutely disqualified under Art. 35.16. Thus, the trial court erred in excusing the venireman on its own motion. Appellant further contends that since the State exhausted all of its peremptory challenges, the error was reversible error citing this Court's decision in *Payton v. State*, 572 S.W.2d 677 (Tex.Cr. App.1978).

▮ It is well settled that a trial judge should not on its own motion excuse a prospective juror for cause unless the juror is absolutely disqualified from serving on a jury. *Martinez v. State*, 621 S.W.2d 797 (Tex.Cr.App.1981); *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr.App.1980); *Payton v. State*, 572 S.W.2d 677 (Tex.Cr.App.1978); *Chambers v. State*, 568 S.W.2d 313 (Tex. Cr.App.1978); *Valore v. State*, 545 S.W.2d 477 (Tex.Cr.App.1977); *Pearce v. State*, 513 S.W.2d 539 (Tex.Cr.App.1974); *Henriksen v. State*, 500 S.W.2d 491 (Tex.Cr.App. 1973). If the court does so, however, reversible error will arise only on a showing of harm to the defendant.

▮ If the trial court erroneously excludes a *qualified* juror, then the State has in effect received the benefit of an additional peremptory strike.[1] *Payton*, supra. Thus, a defendant may show that he was harmed by an erroneous exclusion by showing that the State exhausted its peremptory challenges, and that but for the court's

actions, the juror would have served. *Pearce*, supra.

▮ A different situation arises, however, when the court *sua sponte* excludes a *disqualified* juror: *viz*, a juror subject to a challenge for cause. In such a situation, a showing that the State has used all its peremptory challenges will not suffice to show the defendant was harmed by the court's action. The defendant must establish that he was tried by a jury to which he had a legitimate objection. *Esquivel*, supra; *Henriksen*, supra. Absent such a showing, the improper exclusion will not constitute reversible error.

▮ In the case at bar, the trial judge excluded prospective juror Nolasco pursuant to Art. 35.16(a)(11), V.A.C.C.P. Since the inability to read or write the English language does not constitute an absolute disqualification under Art. 35.19, V.A.C. C.P., the trial court abused its discretion by excluding the juror. We now must determine whether the abuse of discretion rises to the level of reversible error.

▮ The record shows that the State was planning to challenge juror Nolasco for cause on the same ground as that advanced by the trial court. The court simply excluded the juror first. The record also shows that the prospective juror was subject to the challenge chosen by the court and advanced by the State. Thus, we are faced with the erroneous exclusion of a disqualified juror.

As discussed above, a mere showing that the State has exhausted all of its peremptory challenges will not establish that appellant has been harmed by the court's erroneous exclusion. In the instant case, the only allegation of harm advanced by appellant was the State's use of all of its peremptory challenges. Our examination of the record fails to reveal that appellant was tried by a jury to which he had a legitimate objection. Thus, we hold that although the trial court

---

**1.** All emphasis is supplied throughout by the writer of this opinion unless otherwise indi- cated.

improperly excluded the prospective juror, such error was not reversible. Appellant's eighth ground of error is overruled.

In ground of error number nine, appellant contends that the trial court erred in denying his challenge for cause to prospective juror Abelarbo Victor Sueiro in that the prospective juror indicated a bias in favor of the death penalty.

The examination of prospective juror Sueiro indicated that he considered the death penalty an appropriate punishment in some instances. When presented with a situation involving rape, robbery and murder, he indicated that he could not consider a punishment of life imprisonment, provided that the case was properly proved. Sueiro stated that in not considering life punishment to be an appropriate punishment he considered his own daughter, wife and mother. At one point, appellant's attorney asked Sueiro "regardless of what the evidence may be here, you would automatically answer these questions because you would want the death penalty to be the punishment, is that correct?" Sueiro responded "Right." Shortly thereafter, appellant's attorney challenged the prospective juror for cause.

Before the court ruled upon the challenge, the State was permitted to question Sueiro. The State focused upon whether Sueiro would be able to follow the law, and the following discourse took place:

"Q. [Prosecutor] Is that the one—let's talk about murder; what we are trying to find out is if you can follow the law.

"A. [Witness] I would call that another word for that situation, totally forgot about. That is, you kill somebody intentionally, but it would be another situation. That is the—helping a human person that is suffering, right?

"Q. Let's not think about that example for a while. We will go back to the one he has used that you found somebody guilty of capital murder, and you heard the evidence that the person himself had committed robbery, had committed murder, and had committed rape. In that situation, do you think

knowing those facts that a robbery, murder, and rape had occurred, that the answer to Question 1 would be yes based on the evidence? In other words, a person who commits robbery and then commits a murder.

"A. Yes, that would be yes.

"Q. And certainly with a reasonable expectation, so you would answer that question yes because the evidence showed you that it should be answered yes?

"A. Right.

"Q. Now, if the evidence showed you that the conduct of the Defendant, for one reason or the other, wasn't committed deliberately or at the time that he committed that conduct, there wasn't a reasonable expectation that death would result, wouldn't you answer it no?

"A. Right, I would answer it then.

"Q. You would follow the law?

"A. Right.

"Q. If the evidence didn't show you that Question 1 should be answered yes, you would answer it no, just like the law allowed?

"A. Right.

"Q. When you go to Question 2, you have to decide what kind of person he is, and if—remember when you said there might be some facts so bad that you believed by the offense itself—or the things that the Defendant did in the crime—it's that you heard at guilt or innocence, that you could find that there probably—there was a probability that he would commit future acts of criminal violence, right?

"A. Right.

"Q. And is it your understanding that the facts from Mr. Toomey—that Mr. Toomey gave you—that the person intentionally committed robbery, murder, and then rape, that those facts, as you are thinking of it, are so bad that that would be the type of case that you would decide from the evidence that there was a probability he would be a

continuing threat to society, right, so you will answer it yes?

"A. I would answer it yes, but what question? You're giving me another question, the second one?

"Q. Question 2 has asked you whether or not there is a probability that the Defendant would commit future criminal acts.

"A. That is when you decide on the death penalty, right?

"Q. That is questions, but remember, you don't decide on the death penalty, right?

"A. No.

"Q. You decide on the answers to the questions based on the evidence.

"A. Right.

"Q. And then your answers—the legislature has decided based on your answers that the judge assesses either life or death, right?

"A. Right.

"Q. Okay. So if the evidence showed you that he had cold-bloodedly committed a robbery, rape, and murder—

"A. Right.

"Q. In your mind, there would be enough evidence in front of you to show that he probably would commit future acts of criminal violence, isn't that true?

"Q. [sic] That is right.

"Q. Because from the facts that you're imagining there, Mr. Toomey gave you, that is the kind of person that is probably going to do it again, is that correct?

"A. Right.

"Q. And so that is—so you would be agreeing with the legislature, that as you are imagining the fact situation, these questions should be answered yes, right?

"A. Both questions?

"Q. Yes.

"A. Okay.

"Q. But you would be basing—

"A. Very confusing, those questions.

"Q. Okay, but you would base your answers to these questions on the evidence? That is basically what I am asking you.

"A. Right.

"Q. So, if you didn't have any evidence that showed you there was a probability that he would commit future criminal acts that constituted a continuing threat to society, you would answer that question no, wouldn't you?

"A. Right.

"Q. Even if you had already found him guilty of capital murder, right?

"A. Right.

"Q. Now, do you think there might be some situations in which you personally would feel like the death penalty was appropriate, but the legislature, or because the State messed up and didn't present enough evidence to you for you to answer these questions yes, where you would have to answer them no because the evidence doesn't show you that they have been answered yes?

"A. That is right.

"Q. And if that were the case, you would answer them no, right?

"A. Right.

"Q. Even though you personally thought the death penalty should result, is that correct?

"A. Right.

"Q. Or there are certain situations in which your personal opinion that the death penalty should result would be outweighed by the law and you would follow the law?

"A. Right.

"Q. And you would just answer these questions on the evidence?

"A. Right.

"Q. Okay. So I don't want you to get confused because we might be going back and forth here.

"A. No.

"Q. But basically, all I am asking you is: You are not saying that regardless of the evidence, if the evidence showed you that Question 1 should be answered no, okay?

"A. Okay.

"Q. Okay. But if you personally felt he ought to get the death penalty, but the evidence shows you one of these questions should be answered no, you would answer them no, right?

"A. Right.

"Q. Even though you would prefer he got death, you would answer them no, because the law says you must follow the evidence. You might be mad at the State of Texas.

"A. Right. You have to follow the evidence. Somebody has to prove this person committed this crime and be convinced first.

"Q. And if we haven't proved to you that these should be answered yes, you might be mad at us and disagree with the fact he is going to get life, but you would be able to follow the law and answer them no, right?

"A. Right.

After this questioning, the trial court overruled appellant's challenge for cause.

Appellant's attorney was permitted further examination. Sueiro stated that in a situation involving robbery, murder and rape, he would answer the special issues yes so that the death penalty would be assessed, regardless of the evidence. Appellant's counsel renewed his challenge for cause, which was denied.

On further examination by the State, Sueiro stated that he would not disregard the evidence and answer the questions "yes" in order that the death penalty be imposed. Thereafter, appellant's attorney stated his challenge for cause to the prospective juror on the basis that Sueiro would vote automatically for the death penalty.

■■■ Certainly under Art. 35.16(c)(2), V.A.C.C.P., a veniremember may be challenged for cause if he or she has a bias or prejudice against any of the law applicable to the case. *Smith v. State,* 513 S.W.2d 823 (Tex.Cr.App.1974); see also *Martinez v. State,* 588 S.W.2d 954 (Tex.Cr.App.1979);

cf. *Smith v. State,* 573 S.W.2d 763 (Tex.Cr. App.1978). Considering the voir dire in its entirety, however, we cannot say that the trial court abused its discretion in denying the challenge. We especially accord due deference to the trial court given its position to gauge the prospective juror's demeanor. See *Franklin v. State,* 693 S.W.2d 420 (Tex.Cr.App.1985); *Bird v. State,* 692 S.W.2d 65 (Tex.Cr.App.1985), citing *Wainwright v. Witt,* — U.S. —, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). No error is shown. Appellant's ninth ground of error is overruled.

■■■ In ground of error number ten, appellant contends that the trial court erred in excluding for cause potential juror Dr. Michael Mauldin, who expressed reluctance regarding imposition of the death penalty, but who was qualified under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

The record of the voir dire examination reflects that Michael Mauldin held a doctorate degree in schooling.[2] During the initial examination, Dr. Mauldin stated that he believed that the death penalty was appropriate in certain cases. He later stated that he could envision a case where he would feel uncomfortable with the death penalty but still would answer the questions in the affirmative knowing that the death penalty would result. The State's attorney again focused upon the juror's oath, and questioned Dr. Mauldin regarding his ability to follow the law. Dr. Mauldin stated:

"I'm telling you that I do feel that way. I can, it would be very difficult for me. If I didn't in some sense become convinced that this situation should somehow match my restricted, more restrictive standards for what the death penalty ought to be than is defined here, then I would have a hard time following the law which would be, it it [sic] met these two criteria of answering yes. In other words, I couldn't evaluate those independently of that feeling."

2. Dr. Mauldin stated that his graduate education was focused upon cognizant schooling, human learning and memory, language learning, research designs, statistics, and psychology.

The State's attorney later inquired: [Y]ou could not answer the questions based solely on the evidence and give the death penalty ... because it didn't necessarily meet your feelings of what a death penalty should be. Is that correct?" Dr. Mauldin replied "That's correct." Shortly thereafter, the State's attorney challenged the prospective juror for cause, but the trial court refused to excuse the juror at that time.

On further examination, the State asked Dr. Mauldin to consider a situation involving parties to a capital murder. Dr. Mauldin stated that he could very definitely imagine a situation where he could not follow the law even though the law was very clear. The State repeated its challenge for cause, which was again refused by the trial court.

Upon further examination by the State's attorney, the following discussion took place:

"Q. [Mr. Holleman] And if we prove to you that someone was acting with intent to commit capital murder or assist in the commission of the offense, he's solicited somebody to commit it, aided him in the commission of it, directed him on how to commit it or attempted to aid, you could find him guilty of capital murder?

"A. [Witness] Yes.

"Q. Whether or not they did any of the acts that actually caused the death or committed the robbery or whatever. Is that correct?

"A. Yes.

"Q. Okay.

"A. But, I really would have to say that, again, I can envision a situation where it would be very hard for me to answer yes to each of these questions in following that, in good conscious [sic].

"THE COURT: The punishment is not involved at this point, Doctor. Just whether or not you could find them guilty. You do not answer those questions until after you have first found him guilty of the offense.

"THE JUROR: I understand that, but they aren't independent for me.

"Q. [By Mr. Holleman] What do you mean by that?

"A. Well, I mean that if the next result is that I feel it is likely that I would have to answer yes to meet the law there, yet I do not morally feel it is right, I would have trouble doing it.

"Q. As you told us before, you do think you could do it?

"A. That's right, I could not do it.

"Q. Because you can't follow the law when we come to punishment?

"A. That's right.

"Q. So you are back in the same situation where you are going, as a juror, and I do not really—I am not being smart, but this is what it would boil down to as a juror. You would be putting whatever test—these questions be damned or whatever—because before you could live with yourself, the issues or the evidence is going to have to meet your standards of when somebody should be put to death you would return a verdict which would result in somebody's death and many people feel that way and I understand it, but that's basically what you are saying you would be doing, what you think is the proper case for the death penalty. Instead of answering these questions based on the evidence because of your conscience. Is that a fair statement?

"A. That is a fair statement. I agree I could envision evidence that would— the way that is worded, I would have to say yes.

"Q. But your conscience wouldn't allow you to follow the law and answer the question yes because you know the defendant is going to be put to death?

"A. That's right.

"Q. Okay. So there would be situations in your mind where a person under our laws would deserve the death penalty but you certainly could not be a part of that because of your feelings.

"A. Yes.

"Q. Is that correct?

"A. As I understand those two questions, yes.

The trial court sustained the challenge for cause, but appellant's attorney was permitted additional examination.

After appellant's attorney had questioned Dr. Mauldin briefly, the following discussion between the trial court and Dr. Mauldin took place:

"THE COURT: Is that your feeling, Doctor? If the State convinced you beyond a reasonable doubt that the conduct of the defendant that caused the death of the deceased was committed deliberately and with reasonable expectation that the death of the deceased or another would result, you would refuse to answer that question because it doesn't meet your standard?

"DR. MAULDIN: I can invision [sic] a situation where the evidence would meet the definition there, but my moral, my own moral conscience would not allow me to do that, to return the death penalty.

"THE COURT: I'm not asking you would you answer it yes. I'm asking you would you answer it yes or no.

"DR. MAULDING [sic]: Would I answer it?

"THE COURT: In other words, if the State failed to convince you that the conduct of the defendant that caused the death of the deceased was committed deliberately, with a reasonable expectation that the death of the deceased or another would result, if the State didn't convince you beyond a reasonable doubt that it should be answered yes, then you would be required to answer it no.

"DR. MAULDING [sic]: I can see a situation where a person could take a loaded gun, which means to me there is reasonable expectation that death of the deceased could occur, if they went in with a loaded gun expecting they might have to use it and I can see a situation where it's deliberate and that they planned to go in there and they may not deliberately—it may not be deliberate in the sense of a deliberate murder and at some point, a decision is made to kill someone, that is a deliberate act which I would have trouble returning the death penalty on. I could not return it. I can see a situation where I could not personally return the death panelty [sic] even though I would agree that it was committed deliberately with a reasonable expectation that the death of the deceased or another would result.

The State then objected to the prospective juror on the basis that he could not follow the law. The trial court sustained the challenge and excused Dr. Mauldin from jury service.

In his brief, appellant contends that the trial court erred by excusing Dr. Mauldin since he did not state unequivocally that he could not impose the death penalty. Appellant categorizes Dr. Mauldin's responses as general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

We find that the State's challenge for cause of prospective juror Mauldin was proper since Mauldin indicated that he would not be able to answer the special issues in the affirmative unless the State met his stricter standard of proof. See *Hawkins v. State*, 660 S.W.2d 65 (Tex.Cr. App.1983); and *Bodde v. State*, 568 S.W.2d 344 (Tex.Cr.App.1978). Moreover, again according due deference to the trial court's position to assess Dr. Mauldin's demeanor and sincerity, we find that the trial court did not abuse its discretion. See *Franklin*, supra. Appellant's tenth ground of error is overruled.

 In his first three grounds of error, appellant complains that facts relating to the capital offense were improperly admitted during his competency hearing. In the first ground of error, he alleges that the trial court erred in allowing the State to elicit from Dr. John Stafford, appellant's expert witness, what appellant told him about the nature and factual allegations against him.

The record reflects that the following testimony was elicited during the State's cross-examination of Dr. Stafford:

"Q. [Prosecutor] You can answer the question?

"A. [Witness] Okay. Let me see my notes. He said boy said I shot a man.

"Q. Okay. And you, of course, knew what he was actually charged with, is that correct?

"A. That's correct.

"Q. And did you talk to him about the consequences of what might happen to him if he is indeed found guilty of what he's charged with?

"A. I did.

"Q. And what type of question did you ask him in so the jury can know one of the basis [sic] that you are making your opinion on?

"A. I asked him what might happen to someone who shot a person and he said he might go to jail.

"Q. Okay. And you understood, did you understand knowing what he was charged with that that was the only possible punishment?

"A. I understood there might be other consequences.

A defendant's guilt or innocence is not at issue in a hearing on his competency to stand trial, and it is improper to introduce *evidence* of the offense itself. *Callaway v. State*, 594 S.W.2d 440 (Tex.Cr.App.1980) at 443, citing *Ex parte Hagans*, 558 S.W.2d 457 (Tex.Cr.App.1977) and *Townsend v. State*, 427 S.W.2d 55 (Tex.Cr.App.1968). See also *Brandon v. State*, 599 S.W.2d 567 (Tex.Cr.App.1980). *Evidence* of the crime may adversely affect the jury's determination of the defendant's competency to stand trial by confusing them or prejudicing them against the defendant. *Id.* at 580.

■ In the case before us, the complained of testimony did not clearly and explicitly refer to the *facts* of the offense to the extent that appellant was denied a fair hearing on the issue of his competency to stand trial. Cf. *Hollis v. State*, 633 S.W.2d 947 (Tex.App.—Tyler 1982). Appellant's first ground of error is overruled.

■ In ground of error number two, appellant complains that the trial court erred in allowing the State to elicit from Dr. James Hunter that appellant was charged with capital murder. The record reflects the following testimony:

"Q. [Prosecutor] And could you, what exactly, how did you ask it?

"A. I generally start out, what did you do to get into trouble with the law and I don't remember what he replied and I said well, what was your charge and he was able to tell me.

"Q. Did he tell you, what did he tell you the charge was?

"MR. TOOMEY: Your Honor, I object to that question because it calls for hearsay and further calls for matters that are a violation of Michael Goodman's Fifth Amendment Rights and thirdly it calls for matters that are not relevant to the issue at hand, that is his competency.

"THE COURT: Overruled.

"MR. TOMMEY: Can I have a running objection?

"THE COURT: Yes sir.

"Q. What was his answer to what he was charged with?

"A. I recorded on October 6, 1980, 1:15 p.m., pre-trial evaluation says he is charged with capital murder.

"Q. Were you able to check that with the records here?

"A. Right.

"Q. That were sent to you, whether he was correct as to what he was charged with?

"A. That's correct.

"Q. It was correct?

"A. That was correct, yes.

Initially, appellant has not preserved error. The objections made at trial when the complained of testimony was elicited were based upon hearsay, violation of appellant's Fifth Amendment rights, and relevancy. The objection now raised is based upon improper reference to the facts of the of-

fense. Since the present objection does not comport with the objections made at trial, error is not preserved. *Hodge v. State*, 631 S.W.2d 754 (Tex.Cr.App.1982); *Nelson v. State*, 607 S.W.2d 554 (Tex.Cr.App.1980).

■ Appellant contends that error was preserved since he made a "running objection to all questions concerning the offense, the nature of the offense, and everything related to the offense." This "running objection" was made during the State's cross-examination of Dr. Stafford. Six other witnesses testified between Dr. Stafford and Dr. Hunter. Appellant never renewed his objection.

Appellant has not cited, nor have we found, any caselaw which supports the proposition that a "running objection" will preserve error on a matter referred to by any witness at any time during a competency hearing or trial. Such a doctrine would certainly conflict with several cases which hold that error in admission of evidence is cured when the same evidence comes in elsewhere without objection, and that the defendant must object every time the alleged inadmissible evidence is offered. See *Brown v. State*, 640 S.W.2d 275 (Tex.Cr. App.1982); *Boles v. State*, 598 S.W.2d 274 (Tex.Cr.App.1980); *Crocker v. State*, 573 S.W.2d 190 (Tex.Cr.App.1978).

■ Even if the error had been properly preserved, no reversible error occurred. The witness did not refer to the facts of the case. Moreover, the one use of the term "capital murder" did not so confuse or prejudice the jury against appellant that he was deprived of a fair determination on the matter of his competency to stand trial. Cf. *Hollis*, supra. Appellant's second ground of error is overruled.

■ In his third ground of error, appellant contends that the trial court erred in overruling his objection to the charge on the ground that it stated the offense for which appellant was indicted and the date of its alleged commission. The first sentence of the charge set forth the actual offense which appellant was charged with and the date of its alleged commission. The charge also contained instructions that the indictment was not to be considered by

the jury as evidence of appellant's competency to stand trial and that the jury was not to consider appellant's guilt or innocence in their competency determination. Since the charge did not explicitly refer to the facts of the offense, and since the single reference to the offense charged did not confuse or prejudice the jury, we hold that appellant was not denied a fair hearing by the reference contained in the charge. See discussion, supra. Appellant's third ground of error is overruled.

■ In ground of error number four, appellant contends that the trial court erred during the competency hearing in permitting the State's expert witness, Dr. James Hunter, to testify that Dr. Michael Sharp said appellant was guarded and evasive during his interview since such testimony was hearsay. The record shows that the State sought to introduce medical records concerning appellant's admission to Rusk State Hospital for a pre-trial competency determination. The State examined Dr. Hunter, custodian of the hospital records, and introduced the records using Art. 3737e, V.A.C.S., referred to as the Business Records Exception to the hearsay rule.

We have examined the record and find that the material contained in the records concerning appellant's demeanor during the tests was recorded in the usual course of business at the hospital by Dr. Sharp, who personally conducted the tests and recorded his observations at the time they were made. The trial court did not err in admitting the evidence.

■ Even if the trial court had erred, hearsay evidence improperly admitted over objection will constitute reversible error only if there is a reasonable possibility that the evidence is prejudicial to the defendant or may have contributed to his conviction. *Urick v. State*, 662 S.W.2d 348 (Tex.Cr.App.1983); *Ward v. State*, 657 S.W.2d 133 (Tex.Cr.App.1983); *Garrett v. State*, 641 S.W.2d 232 (Tex.Cr.App.1981). The evidence admitted in the instant case was not so prejudicial so as to constitute

reversible error. Appellant's fourth ground of error is overruled.

In ground of error number five, appellant contends that the trial court erred in admitting hearsay evidence during the competency hearing regarding the results of intelligence quotient tests performed upon appellant when he was admitted to Rusk State Hospital for evaluation. Appellant contends that the evidence should not have been admitted since Art. 3737e, V.A.T.C.S. does not permit admission of diagnostic entries in medical records if those entries are genuinely disputed, citing *Loper v. Andrews*, 404 S.W.2d 300 (Tex.1966), and *Otis Elevator v. Wood*, 436 S.W.2d 324 (Tex. 1968).

Before considering the substance of appellant's contention, we address the State's reply on this ground of error that error was not properly preserved for review. The record reflects that when the State sought to elicit the record entries through Dr. Hunter's testimony, appellant made the following objection:

> "Your Honor, I again object to the question because it calls for hearsay within hearsay. The business records cover the fact that the records are there, but doesn't recover [sic] the fact that someone says something in the record which is hearsay in hearsay and that's my objection."

In order to preserve error regarding evidence admission, the objection made to the evidence must be sufficiently specific so as to inform the trial court of the basis of the objection; a general objection is generally deemed insufficient. *Quinones v. State*, 592 S.W.2d 933 (Tex.Cr. App.1980); *Bouchillon v. State*, 540 S.W.2d 319 (Tex.Cr.App.1976). Moreover, the objection made at trial must comport with the objection raised on appeal. *Hodge*, supra; *Nelson*, supra.

In the case at bar, the trial objection concerned hearsay. The objection now advanced concerns admission of diagnosis under the *Loper* doctrine. In *Granviel v.*

State, 552 S.W.2d 107 (Tex.Cr.App.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977), we were faced with a similar situation and held that any error regarding admission of a diagnosis in a medical record was not preserved when the trial objection was made solely on hearsay grounds. Applying *Granviel* to the instant case, no error was preserved.

We will, however, consider the substance of appellant's claim in the interests of justice. In *Loper*, supra, the Texas Supreme Court held that in order for a medical record containing a diagnosis to be admissible under Art. 3737e, V.A.T.C.S., the diagnosis recorded must rest in reasonable medical certainty.[3] *Id.* at 305. The *Loper* doctrine is applicable to criminal cases and has been interpreted to authorize admission of a hearsay diagnosis contained in a medical record if the diagnosis is one upon which competent physicians would normally agree. *Granviel*, supra at 122, citing *Eubanks v. Winn*, 469 S.W.2d 292 (Tex.Civ.App.—Houston [14th] 1971, writ ref'd, n.r.e.). Assuming for appellant's benefit that the determination of an intelligence quotient based upon standard psychological tests is a "diagnosis" for record entry purposes, in order to determine whether the admission of the complained of evidence was improper, we must examine the record. If the record discloses that appellant's intelligence quotient score was a contested matter and not subject to reasonable certainty, then the trial court erred in admitting the record that contained the I.Q. assessment.

First, we will examine the testimony presented by the State's expert witness and custodian of records at Rusk State Hospital, Dr. James Hunter. After outlining his qualifications and specialization of fourteen years' experience in forensic psychiatry, Dr. Hunter testified concerning the general admission procedures at Rusk State Hospital when a patient is admitted for a pre-trial competency determination.

**3.** The *Loper* doctrine was abandoned in the new Texas Rules of Evidence governing civil cases. See Houston Law Review, Texas Rules of Evidence Handbook, Vol. 20, Jan. and Mar. 1983, No. 1 and 2, p. 520.

He stated that all patients, including appellant, receive complete physical examinations and a complete battery of psychological tests. Dr. Hunter later testified that appellant's psychological tests were administered by Dr. Sharp, who recorded the test results at the time the tests were conducted and in the regular course of hospital business. The witness was then permitted to testify that the records indicated that the tests conducted by Dr. Sharp indicated that appellant's overall I.Q. was 68. Later in his testimony, Dr. Hunter testified that this assessment of appellant's I.Q. placed appellant in the mildly retarded range.

Next, we examine the testimony of appellant's expert witness, Dr. Floyd Jennings, in order to determine whether the issue regarding appellant's I.Q. assessment was contested. Appellant elicited from Dr. Jennings, a clinical psychologist of ten years' experience, that he had personally conducted standard psychological tests to determine appellant's intelligence quotient. Dr. Jennings testified that he found appellant's I.Q. to be 59, which was within the range of mild retardation.

When the State's attorney cross-examined Dr. Jennings, the following exchange occurred:

"Q. [Prosecutor] Now I know ... there are at least in many cases, a lot of difference in opinions between psychologists as to maybe certain tests that are given or certain interpretations or so on. Is that true or untrue?

. . . . .

"A. [Witness] ... [W]ell in the case of Mr. Goodman, he was given objective instruments which are clearly normal to stand by, and they did the same thing at Rusk [State Hospital].

"Q. Are you saying then there is no area for disagreement with your diagnosis of Mr. Goodman?

"A. In terms of his mental retardation, I think both I and the Rusk people agree.

Later in his testimony, Dr. Jennings indicated that given the statistical error limits of the test, appellant's score may have been up to ten points higher than Dr. Jennings' assessment.

We find that based upon the record, appellant's intelligence quotient was not contested.[4] Thus, the entry in the hospital records reflecting Dr. Sharp's finding of I.Q. was admissible under the *Loper* doctrine. Appellant's fifth ground of error is overruled.

In his sixth ground of error, appellant contends that the trial court erred at the competency hearing in allowing Dr. Hunter to testify that the personality tests conducted upon appellant showed him to have social and vocational adequacies with proper education and training since such evidence was hearsay. The complained of evidence was admitted through the hospital records containing the test results obtained by Dr. Sharp. As previously discussed in our disposition of appellant's fourth ground of error, the results recorded on the hospital record were properly admitted. Appellant's sixth ground of error is overruled.

In grounds of error numbers eleven and twelve, appellant contends that, given appellant's mental retardation, there was insufficient evidence presented by the State to prove beyond a reasonable doubt that appellant acted with the deliberateness required in special issue number one, V.A.C. C.P. § 37.071(b)(1) or that appellant would commit acts of violence that would constitute a continuing threat to society as required in special issue number two, V.A.C. C.P., § 37.071(b)(2).

The record reflects that at the guilt-innocence stage of the trial, the following facts concerning the instant offense were presented. On October 16, 1979, Jackie

4. The record reflects that Dr. Jennings, appellant's expert witness, and Dr. Hunter, the State's expert witness, disagreed regarding whether appellant was competent to stand trial. Both witnesses had personally examined appellant and made their competency determinations based upon all factors, including appellant's mild retardation. The record does not reflect, however, that the witnesses materially disagreed as to appellant's intelligence quotient score.

Ouin and Rosie Gallegos met at the Riviera Lounge. Gallegos discovered that she had lost the keys to her van. Ouin assisted Gallegos in gaining entry to the van, where she found her keys. As she was sitting in the driver's seat with Ouin standing at the door, appellant and two other men approached the van. Gallegos heard Ouin say "Hey, what's going on?" She heard a noise "like a firecracker," and saw appellant shoot Ouin. Appellant pointed the pistol at Gallegos and told her to move over. Appellant stated "You shut up—I shot him and I'll shoot you." After Ouin's body was lifted into the van, appellant and the two others got into the van. Appellant drove the van around for thirty to forty-five minutes while Gallegos begged him to "take Jackie to the hospital." Appellant's reply was "Shut your mouth up, you b____, or I'll blow your head off." After one of the other abductors urged appellant to take Ouin to the hospital, appellant drove to the parking lot of the Jefferson Davis Hospital where his two companions dumped Ouin out on the parking lot. Gallegos tried to escape from the van, but appellant grabbed her by the hair, pointed the gun at her, and told her not to move. After leaving Ouin, appellant drove the van away from the hospital. A hospital employee saw the men leave Ouin's body in the parking lot. When the night supervisor of nurses was summoned and arrived, Ouin "had no signs of life, no pulse, no respiration."

After leaving the hospital, appellant ordered Gallegos to disrobe. One of his companions stated that he was going to rape Gallegos and appellant replied "Go ahead, because I am too." After the companion raped Gallegos, he traded places with appellant, who then raped her while pointing a pistol at her head. Afterwards, appellant again took the wheel and continued driving. After Gallegos had been in the van for approximately one hour and 45 minutes, she was able to escape. She testified that when she got out of the van, appellant put it into reverse gear and backed toward her. She avoided being hit by jumping into a ditch.

Appellant's counsel called Lisa Young, who lived in the same area as appellant.

She testified she and appellant were watching television together. When a news report covering the discovery of Ouin's body at the hospital parking lot was televised, appellant asked Young whether she would believe him if he told her something, to which she replied "yes." He then stated that he had "done that."

At the punishment stage of trial, the State proved that appellant had a prior felony conviction for burglary of a building and had committed several petty assaults.

In considering appellant's claim that the evidence was insufficient to support affirmative responses to the two special issues, we must evaluate the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have made the findings beyond a reasonable doubt. *DeGarmo v. State*, 691 S.W.2d 657 (Tex.Cr.App.1985), and cases cited therein at 661. Of course, in passing upon these questions the jury is permitted to consider all of the evidence presented at the guilt-innocence stage of trial. *Garcia v. State*, 626 S.W.2d 46 (Tex.Cr.App.1982), and cases cited therein at 51.

We turn first to appellant's contention that considering appellant's mental retardation there is insufficient evidence to support the jury's finding that he acted "deliberately." In *Cannon v. State*, 691 S.W.2d 664 (Tex.Cr.App.1985), we stated that the requirement that the defendant's conduct be committed deliberately did not necessitate a showing that the act was premeditated. *Id.* at 677, citing *Granviel*, supra. Moreover, we stated that to find the act of deliberateness, there must be "the moment of deliberation and the determination on the part of the actor to kill." *Cannon*, supra.

In the case at bar, the experts agreed that appellant was mildly retarded. The jury was able to pass upon the credibility of these witnesses and assess the weight to be given their testimony. We find that there is ample evidence from which the jury could conclude that appellant acted deliberately despite his mild re-

tardation. No error is shown. See generally *Fearance v. State,* 620 S.W.2d 577 (Tex.Cr.App.1981). Appellant's tenth ground of error is overruled.

■ Appellant also contends that, in light of appellant's retardation, there was insufficient evidence presented to support the jury's finding that there was a probability that he would commit criminal acts of violence that would constitute a continuing threat to society. Again, in passing upon this issue, the jury is permitted to consider all of the evidence adduced at the guilt stage of trial. *Garcia,* supra. Appellant offered no evidence in mitigation, save testimony regarding his mild retardation. We find that there was sufficient evidence presented from which a reasonable juror could have answered the second special issue in the affirmative beyond a reasonable doubt. Ground of error number twelve is overruled.

■ In his thirteenth ground of error, appellant contends that the death penalty applied in this case is cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, and Art. I, Sec. 13, of the Texas Constitution in view of appellant's mental retardation. The Texas death penalty scheme has already been found to be constitutional in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) on the basis that relevant information, including a defendant's mental status, may be presented to the jury regarding the defendant. We reject appellant's suggestion that applying the death penalty to a mildly mentally retarded person constitutes cruel and unusual punishment. Appellant's thirteenth ground of error is overruled.

In ground of error number fourteen, appellant contends that the trial court erred during the punishment phase of trial in admitting evidence that appellant had problems with the law as a juvenile, specifically that appellant stole a bicycle as a youth and was sent to reform school. Appellant directs our attention to Tex.Fam.Code Ann., § 51.13(b) (Vernon 1975), which provides:

The adjudication or disposition of a child or evidence adduced in a hearing under this title may be used only in subsequent proceedings under this title in which the child is a party or in subsequent sentencing proceedings in criminal court against the child *to the extent permitted by the Texas Code of Criminal Procedure, 1965.* (Emphasis supplied)

Appellant contends that the rule prohibiting admission of juvenile adjudications in non-capital cases as set forth in *Ruth v. State,* 522 S.W.2d 517, 519 (Tex.Cr.App. 1975) should be extended to capital offenses. According to appellant, if the rule is not applicable to capital cases, then it is unconstitutional in that it denies appellant equal protection because it distinguishes between capital and non-capital defendants without any reasonable basis.

■ Assuming that the evidence relating to appellant's theft of the bicycle and his subsequent admission to reform school falls within the ambit of Sec. 51.13 of the Family Code, we find that the trial court did not err in admitting the evidence. The rule barring admission of evidence pertaining to juvenile adjudications is not applicable to capital murder cases under Art. 37.-071, V.A.C.C.P., which permits admission of evidence regarding any matter the court deems relevant to the sentence. No error is shown. Appellant's fourteenth ground of error is overruled.

The judgment of the trial court is affirmed.

TOM G. DAVIS and McCORMICK, JJ., not participating.