IN THE COURT OF CRIMINAL APPEALS


OF TEXAS
 





No. AP-74,769





BILLY JACK CRUTSINGER, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL FROM CAUSE NO. 0885306D


IN THE 213
TH DISTRICT COURT


TARRANT COUNTY






 Holcomb, J., delivered the opinion of the Court, in which Keller, P.J., and
Meyers, Johnson, Keasler, Hervey, and Cochran, JJ., joined. Price and
Womack, JJ., concurred in the result.


O P I N I O N



 In September 2003, a jury convicted appellant of capital murder. Tex. Pen. Code 
§ 19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of
Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced
appellant to death. Art. 37.071, § 2(g). (1) Direct appeal to this Court is automatic. Art.
37.071, § 2(h). Appellant raises five points of error. We affirm.

VOIR DIRE


 In his second point of error, appellant claims that the trial court erred by sua sponte
excusing prospective juror Enlow over appellant's objection that he was not given notice
or an opportunity to address the venire person. As authority for this point, appellant cites
Green v. State, 764 S.W.2d 242 (Tex. Crim. App. 1989), cert. denied, 507 U.S. 1020
(1993), and Goodman v. State, 701 S.W.2d 850, 856 (Tex. Crim. App. 1985), (2) which
stand for the proposition that "[t]he trial judge should not on its own motion excuse a
juror for cause unless the juror is absolutely disqualified from serving as a juror." 
Appellant's use of this authority is mistaken. 

 Green and Goodman discuss the propriety of a trial court granting challenges for
cause under Articles 35.16 and 35.19. The trial court in this case, on the other hand,
specifically stated that it had excused Enlow under Article 35.03 because she had
previously arranged travel plans. 

 This Court has consistently held that Article 35.03 gives a trial court broad
discretion to excuse prospective jurors for good reason. See, e.g., Black v. State, 26
S.W.3d 895, 899 (Tex. Crim. App. 2000)(holding that trial court did not abuse its
discretion in sua sponte excusing a prospective juror off the record and out of the
presence of the attorneys and the appellant because she had a hearing problem). Under
Article 35.03, "the court shall . . . hear and determine excuses offered for not serving as a
juror, and if the court deems the excuse sufficient, the court shall discharge the juror or
postpone the juror's service[.]" Unless the excuse given is economic in nature, neither
appellant nor his attorney is required to be present. See Tex. Gov't Code § 62.110(c);
Black, 26 S.W.3d at 900. The postponement or cancellation of jury service because of a
pre-existing scheduling conflict is a legitimate exercise of the trial court's discretion
under Article 35.03. See Jones v. State, 119 S.W.3d 766, 790 (Tex. Crim. App. 2003),
cert. denied, 542 U.S. 905 (2004). Point of error two is overruled.

LEGALITY OF ARREST AND ADMISSION OF EVIDENCE


 Appellant complains in his fourth point of error that the taint of his illegal arrest
was not sufficiently attenuated so as to authorize the admission of his confession, DNA
sample, and other evidence obtained pursuant to his illegal arrest. A review of the
pertinent facts is necessary to address this point.

 On April 6, 2003, appellant entered the home of eighty-nine-year-old Pearl
Magouirk and her seventy-one-year-old daughter Patricia Syren and stabbed them both to
death. Appellant then took items from the house including Syren's Cadillac and credit
card. Magouirk's and Syren's bodies were discovered on April 8, 2003. While
investigating the crime, officers learned that Syren's credit card was being used in
Galveston, Texas. The detectives contacted the Galveston Police Department and
traveled to the city to further investigate. The Galveston police determined that the
person using the credit card was currently in one of several bars in Galveston. The
investigation ultimately led Officer Clemente Garcia to a man later identified as appellant. 
When Garcia approached appellant and asked him his name, appellant did not initially
answer. When Garcia asked appellant for his name again, appellant told him his name
was "David." Garcia arrested appellant for failing to identify himself and read him his
Miranda rights. (3) After reading appellant his rights, Garcia asked him again for his name,
and appellant identified himself as "David Townsend." Garcia took appellant to the
Galveston Police Department where he subsequently was able to properly identify him.

 While in the holding cell, appellant was introduced to Detective John McCaskill of
the Fort Worth Police Department. McCaskill asked appellant if he could see his hands,
and appellant obliged. (4) Immediately thereafter, McCaskill left the area where appellant
was being held. A few minutes later, appellant said that he had "messed up" and asked to
speak to McCaskill. Appellant was then taken to an interview room where McCaskill met
with him and again read him his rights. Appellant subsequently consented to having a
DNA sample taken from him and to a search of a black duffel bag that had been in his
possession when he was arrested. After McCaskill again read appellant his legal
warnings and appellant again waived them, appellant confessed in a tape- recorded
statement to killing the two women in Fort Worth and taking their property. In the
confession, appellant told officers where other evidence of the crime could be found. (5)

 After a pre-trial hearing on appellant's motion to suppress, the trial court found
that appellant had waived his legal rights and had voluntarily signed the consent forms
allowing the police to collect DNA evidence and to search his duffel bag. The court also
determined that appellant had voluntarily given a recorded statement and was not
threatened, coerced, or promised anything.

 The court concluded that, although the Galveston police had probable cause to
arrest appellant for the offense of credit card abuse, a warrantless arrest was not justified
because there was insufficient evidence to show that the defendant was about to escape. 
The court further concluded that appellant did not commit the offense of failure to
identify before he was arrested. Therefore, the police illegally arrested appellant on
statutory grounds. See Tex. Pen. Code Ch. 14. 

 Turning to an attenuation of the taint analysis, the court determined that the short
time that passed between appellant's arrest and his confession was not important due to
the facts in the case. Specifically, appellant was given his warnings three times before he
completed the oral confession. He indicated that he understood his rights each time, but
he never invoked them. Significant intervening circumstances were present in the case,
including the fact that after his arrest appellant became very emotional, asked to speak to
McCaskill, and was very cooperative with the police during the detention and
investigation. The court determined that appellant's request to speak to McCaskill was an
independent act of free will. The court concluded that: although appellant was illegally
arrested, the police conduct was not purposeful or flagrant; probable cause existed for
arresting appellant for credit card abuse, therefore his arrest was not a gross violation of
the legal process; and appellant's confession was not a product of coercion or duress. 
Thus, the court concluded that any taint from the illegal arrest was sufficiently attenuated,
and the confession and any other evidence discovered after appellant asked to speak to
McCaskill was admissible.

 The trial court was correct in its determinations. Texas Penal Code section 38.02,
Failure to Identify, provides in pertinent part:

 (a) A person commits an offense if he intentionally refuses to give his
name . . . to a peace officer who has lawfully arrested the person and
requested the information.


 (b) A person commits an offense if he intentionally gives a false or
fictitious name . . . to a peace officer who has:


 (1) lawfully arrested the person; 

 

 (2) lawfully detained the person[.]


When appellant refused to give Garcia his name, he was not under arrest. Therefore,
subsection (a) does not apply. According to the officer's testimony at the suppression
hearing, it was after appellant gave him the name of "David" that he decided to detain and
arrest him. Under these facts, appellant did not commit the offense of failing to identify
himself. Further, the officers provided no evidence at the suppression hearing to justify a
warrantless arrest, such as a showing that appellant was about to escape. Thus, the trial
court properly determined that appellant was illegally arrested.

 The next question is whether the resulting taint on the evidence was attenuated so
that the evidence was admissible notwithstanding the illegal arrest. See Hankins v. State,
132 S.W.3d 380, 389-90 (Tex. Crim. App.), cert. denied, 543 U.S. 944 (2004). In
assessing whether the taint on the evidence is sufficiently attenuated, the United States
Supreme Court has identified the following factors for consideration:

 (1) whether Miranda warnings were given;

 (2) the temporal proximity of the arrest and the confession;

 (3) the presence of intervening circumstances; and

 (4) the purpose and flagrancy of the official misconduct.

Brown v. Illinois, 422 U.S. 590, 598-99 (1975). 

 Appellant was first given his warnings when he was arrested. Appellant was again
read his warnings prior to McCaskill's interview. At this time, McCaskill also had him
show that he waived his rights by signing a warning form. Finally, appellant again
received his legal warnings at the beginning of the tape-recorded statement. Because the
record clearly shows that appellant received and waived his legal rights, this factor
weighs in favor of admission of the evidence.

 With regard to temporal proximity, the testimony shows that less than one hour to
an hour and a half elapsed between appellant's arrest and his interview with McCaskill. 
Arguably, this factor weighs in appellant's favor. However, as the testimony indicated,
very shortly after McCaskill stepped out of the holding room, appellant became
emotional, stated that he had "messed up," and asked to speak to the detective. 
Appellant's request was a product of his own free will and an intervening circumstance
which weighs heavily in the State's favor.

 Finally, the official misconduct was not purposeful or flagrant. The evidence that
the police had collected before appellant's arrest showed that he was directly connected to
the use of a credit card stolen from one of the Fort Worth victims. Because the police did
not observe the illegal use directly, they were required to obtain a warrant in order to
arrest appellant for credit card abuse or show a reason why a warrant was not necessary. 
They did neither. However, the fact remains that the police arguably had enough
information to get a warrant based upon probable cause. The fact that Garcia improperly
arrested appellant on a different charge, which he thought was correct under the
circumstances, does not make the conduct purposeful or flagrant.

 Under the facts of this case, the trial court reasonably concluded that any evidence
obtained after appellant requested to speak to McCaskill was sufficiently attenuated from
the illegal arrest as to be admissible. Appellant's fourth point of error is overruled.

CONSTITUTIONALITY


 In his first point of error, appellant asserts that the trial court should have granted
his motion to quash the indictment because the death penalty is unconstitutional in that
the determination to seek the death penalty is arbitrary and "overridden by the financial
situation of individual counties." In essence, appellant argues that there should be a
statewide policy or standard for determining in which cases the State will seek the death
penalty as opposed to leaving the decision in the hands of the individual district attorneys.

 This claim has previously been presented to this Court. In the first two cases, this
Court declined to review the merits of the claim because the respective appellants had
failed to provide empirical data, case law, or other factual bases that would provide a
foundation for such a review. King v. State, 953 S.W.2d 266, 274 (Tex. Crim. App.
1997); Bell v. State, 938 S.W.2d 35, 55 (Tex. Crim. App. 1996). Some years later, in
Allen v. State, 108 S.W.3d 281, 285-87 (Tex. Crim. App. 2003), cert. denied, 540 U.S.
1185 (2004), the appellant provided tables from the Texas Department of Criminal
Justice's website showing the number of offenders sentenced to death and the number of
offenders executed from each county in Texas. He also provided a press release and other
newspaper articles indicating the high cost of prosecuting death penalty cases and stating
that "[r]ural counties cannot always afford to try a death penalty case." Id. at 286. Based
upon these documents, the appellant then speculated that "[f]inancial constraints in each
of the 254 counties control the decision whether to seek the death penalty." Id. 

 The Court noted in Allen that, while the appellant had provided the Court with the
number of offenders sentenced to death and the number of offenders executed from each
county, he failed to provide budgetary data for each of these counties. Id. The Court also
noted that one of the articles cited by the appellant stated that an ample budget was only
one of several factors that contributed to the higher number of convictions in that county.
Id. Finally, the Court commented that, "[w]hile larger counties may be in a better
financial position to seek the death penalty . . . than smaller or poorer counties, it is
important to note . . . that 'the Capital Litigation section of the Texas Attorney General's
office exists especially to aid smaller counties in prosecuting capital cases.'" Id. at 286
n.3. We ultimately overruled the point stating that the appellant had "made no threshold
showing of disparate treatment between himself and other similarly situated defendants." 
Id. at 287. 

 At the hearing on the motion to quash the indictment in the instant case, appellant
stated that he had sent open records requests to each of the 254 counties in the state, the
Attorney General's Office, and the Texas Comptroller's Office. Of these requests, over
200 counties responded but only about 100 had "useable data." The requests sought the
following information for the years 1999-2003, inclusive: the population of the county,
the number of indictments presented in capital cases, the amount of any budget for death
penalty cases, the amount of any budget for non-death penalty cases, and any amounts
spent in each of those categories. Appellant asked for similar budgetary information from
the Attorney General and the Texas Comptroller, as well as the number of cases in which
the Attorney General had given assistance. Based upon the requests and the responses,
appellant asserts that he has "complied" with the dictates of the Allen case and that this
Court should review the merits of his claim. 

 Although we pointed out that the appellant failed to provide us with budgetary data
in Allen, appellant has overestimated the significance of that statement. Because a
prosecutor has discretion to seek or not to seek the death penalty in a given case, 
Hankins, 132 S.W.3d at 387; Cantu v. State, 842 S.W.2d 667, 692 (Tex. Crim. App.
1992); Gregg v. Georgia, 428 U.S. 153, 199 (1976) (holding prosecutorial discretion not
unconstitutional), the amount of resources available, if a factor at all, is only one of
numerous factors that may bear upon the exercise of a prosecutor's discretion. The
exercise of prosecutorial discretion in an individual case necessarily employs the
consideration of various factors including but not limited to: the facts of the case itself,
the heinousness of the crime, whether the victim was defenseless, the location of the
crime, the callousness of the execution, the particular defendant's history, and the level of
the defendant's participation in the offense. We have held that prosecutorial discretion
does not violate the Eighth and Fourteenth Amendments. Hankins, 132 S.W.3d at 387;
Ladd v. State, 3 S.W.3d 547, 574 (Tex. Crim. App. 1999). Given the broad discretion
that a prosecutor possesses when deciding whether to pursue the death penalty, appellant
cannot show that the trial court abused its discretion in failing to quash the indictment and
declare the death penalty unconstitutional. Appellant's first point of error is overruled.

 In his third point of error, appellant asserts that the "10/12" rule of Article 37.071

violates the constitution. This Court has previously considered and rejected this claim,
and appellant has given us no reason to reconsider it here. Escamilla v. State, 143 S.W.3d
814, 828 (Tex. Crim. App. 2004), cert. denied, 125 S.Ct. 1697 (2005). Appellant's third
point of error is overruled.

 In his fifth point of error, appellant claims that the mitigation question submitted to
the jury pursuant to Article 37.071, section 2(e), is unconstitutional because the statute
does not require the State to prove beyond a reasonable doubt that there was insufficient
mitigating evidence to support a life sentence. Appellant relies upon the United States
Supreme Court's opinions in Ring v. Arizona, 536 U.S. 584 (2002), and Apprendi v. New
Jersey, 530 U.S. 466 (2000), to support his argument. We have previously rejected this
claim, and appellant has given us no reason to revisit the issue here. See Perry v. State,
158 S.W.3d 438, 446-47 (Tex. Crim. App. 2004), cert. denied, 126 S.Ct. 416 (2005). 
Appellant's fifth point of error is overruled. 

 We affirm the judgment of the trial court. 



DELIVERED MAY 10, 2006


PUBLISH
1. All references to articles refer to those in the Texas Code of Criminal Procedure.
2. Goodman was overruled by Hernandez v. State, 757 S.W.2d 744, 752 (Tex. Crim. App.
1988), which was in turn overruled by Fuller v. State, 829 S.W.2d 191, 200 (Tex. Crim. App.
1992).
3. Miranda v. Arizona, 384 U.S. 436 (1966); see also Art. 38.22.
4. Blood found at the scene of the crime appeared to belong to the perpetrator, who may
have cut himself when he committed the crime.
5. Appellant does not argue that the giving of his confession or the giving of his consent
for the two searches was in any way involuntary.