Michael James WHITE, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–88–00116–CR.

Court of Appeals of Texas, Tyler.

Oct. 31, 1989.

Odis R. Hill, Longview, for appellant.

O.W. Loyd, II, Dist. Atty., Gilmer, for appellee.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

COLLEY, Justice.

On May 19, 1989, we delivered our original opinion in this cause, affirming the trial court's judgment. Appellant Michael James White filed his timely motion for rehearing by which he correctly notices that we made several inadvertent errors, viz., that appellant's punishment was assessed by the trial judge rather than the jury, and that his sole point of error on appeal complained of the testimony of only five of the State's witnesses instead of six.

In his motion for rehearing appellant alleges that we erred in three respects, to wit:

[ (1) ] [B]y *sua sponte* considering whether Appellant had made sufficient objection to testimony by several witnesses of hearsay statements purportedly made by decedent, and thus whether Appellant had properly preserved his claim of error as to the introduction of such testimony; by failing to assert in its brief or at oral argument that Appellant had not properly preserved such error, the State committed procedural default and thus waived that argument.

[ (2) ] [I]n effectively adopting a *per se* rule that the running objection to testimony concerning decedent's hearsay statements granted to Appellant by the trial court during the testimony of the first State's witness applied only to the testimony of that witness, and ruling that therefore Appellant waived any error in the introduction of testimony concerning decedent's hearsay statements by several later witnesses; in context, Appellant was entitled to rely on the running objection granted by the trial court as applying to all testimony of decedent's hearsay statements by *all* later witnesses without the need to repeat the objection with each new witness.

[ (3) ] [I]n holding that the trial court's error in permitting introduction of concededly inadmissible testimony concerning decedent's hearsay statements was harmless with respect to both guilt-innocence and punishment.

█ In his first point of error, appellant claims that we lacked authority to consider "sua sponte" whether his "running" objection granted during Maxine Laws' testimony was effective to preserve the errors of the trial court in admitting the hearsay testimony of the four remaining State witnesses at the State's case in chief, and of a fifth State witness, Barbara Williams, who testified for the State in rebuttal of appellant's evidence. In essence, appellant claims that since the State failed to assert in its brief that he did not preserve the errors asserted by a sufficient "running" objection, this court had no right to so rule. In other words, appellant argues that this court was limited to legal reasoning supplied by the State's brief in deciding appellant's point of error on appeal. That argument is patently unmeritorious. It erroneously equates assigned error with law and reasoning supporting a ruling on the claimed error. The argument urges a non-existent rule of appellate procedure which, if expanded, would require an intermediate appellate court to sustain all of an appellant's points of error in criminal cases where the State fails to file a reply brief. Neither *Tallant v. State,* 742 S.W.2d 292 (Tex.Cr.App.1987), nor any of the other cases cited by appellant prescribes such a rule.

■ Contrary to appellant's claim, this court has an inherent right to address and resolve a point of error by resorting to any principle of law or rationale applicable under the facts and circumstances of the case. We have done that. Appellant's first point of error on his motion for rehearing is overruled.

Appellant alleges by his second point that we erred in adopting a "per se rule" for the determination of the sufficiency of the so-called "running" objection in all cases. Appellant apparently reads our opinion to mean "that a running objection to inadmissible testimony extends only to the witness during whose testimony the running objection was granted...." (Appellant's motion for rehearing at page 15.) That interpretation of our opinion is unwarranted and erroneous. Our ruling was clearly limited "to the facts and circumstances of this case...." (Slip opinion at 13.) Furthermore, appellant's argument disregards the general form[1] of the objection made to Maxine Laws' testimony. In the context of the record surrounding Mrs. Laws' testimony, and previous hearsay objections thereto, it seems quite clear that the court's grant of the requested "running" objection was limited to Mrs. Laws' testimony. Any other analysis of the record would require that we ignore the relationship between Tex.R.Crim.Evid. 103(a)(1) and the "running" ("continuing") objection practice deeply rooted in Texas. Appellant's second point of error on rehearing is overruled.

■ Finally, we overrule appellant's third point of error on rehearing which complains of our holding that the errors in admitting the hearsay testimony of Maxine Laws were harmless. The unchallenged testimony of Kimberly Saul[2] and the non-hearsay testimony of the other State witnesses, which is fully discussed in our opinion, and, in particular, the testimony of Bonnie Pike, show that appellant physically abused the murder victim on several occasions, and that Bonnie Pike had observed that the victim had a "black eye" and bruises on her body. Appellant testified at trial and admitted that he and the victim had arguments and "fights" and that he had struck his wife, but denied that he did so with any intention of hurting her. We remain persuaded that the errors committed by the trial court in admitting the objected-to hearsay testimony of Maxine Laws were harmless under the standard of Tex.R.App.P. 81(b)(2). Appellant's third point of error is overruled.

We overrule appellant's motion for rehearing. However, to correct our inadvertent errors, we withdraw our May 19, 1989, opinion and substitute therefor the following:

Michael James White was convicted of the murder of his wife, Debra Laws White (Debbie) by a jury who assessed his punishment at twenty years. We will affirm the conviction.

The record reveals that the victim died on April 19, 1987, from a shotgun wound to her chest. The loss of blood from such wound, according to the medical testimony, was the immediate cause of the victim's death.

By his sole point of error, White claims that the trial court erred reversibly in admitting into evidence inadmissible hearsay testimony of six State witnesses. The pertinent testimony of those witnesses, viz., Maxine Laws and J.W. Laws—parents of the victim, Bonnie Pike and her husband Robert Pike—neighbors and close friends of the victim, Dennis Gray—a resident of the Pike household, and Barbara Williams—a sister of the murder victim, will be discussed in full upon consideration of the point of error.

Maxine Laws testified that at "about midnight" on a Saturday night in February, 1987, the victim, Debbie, telephoned her and asked, "[M]ama, can you come get me[?]" The prosecutor then asked her, "What did [Debbie] tell you had happened between her and her husband, Michael

---

1. The objection made reads as follows:
"[C]an we reserve our objection to hearsay testimony and have a running objection to it?"

2. Appellant does not complain in this court of this witness's testimony.

White?," at which point defense counsel objected [3] on hearsay grounds. The objection was overruled, whereupon the prosecutor again asked: "[W]hat did she say happened?" Laws responded, "She said that he [White] hit her and pushed her out [of] the truck, and left her on the side of the road." The prosecutor then asked, "Did she tell you what he [White] told her that night? Did she relate the conversation to you that they had?" Defense counsel objected in these words: "Your Honor, can we reserve our objection to hearsay testimony and have a running objection to it?" The trial court replied, "You surely may." From this point on, the record reveals that White did not renew or repeat his hearsay objection to Maxine Laws' remaining testimony; nor did he make a hearsay objection to any portions of the testimonies of the remaining five above-named State witnesses.

Maxine Laws thereafter testified that Debbie also stated to her "that she and [White] had had an argument over ... the window ... of the truck." Laws further quoted Debbie's statements concerning the conversation which transpired between Debbie and White during the truck incident. In substance, Laws testified that Debbie told her that she had wanted White to raise the window of the truck in which she and White were riding. When she made her desire known to White, he had informed her, "[I]f you want the blankety blank window up you put it up yourself." Laws then related that, according to her daughter, "she reached over him to [put the truck window] up and he pushed her by the arm and pushed her out the door of the truck...."

In response to the prosecutor's subsequent questions, Laws testified that her daughter later defended White in the incident, saying, "[M]other, Mike said he is sorry.[,]" and "[M]other, it was partly my fault too, I guess I'm to blame too."

Defense counsel, on cross-examination, elicited the following responses from Maxine Laws:

There were many times that I saw bruises on Debbie that I wondered where they came from, but she'd always make up some excuse; but they were bruises in places [on Debbie's body] that you don't get by bumping a door or a bedstead, that sort of thing."

Maxine Laws was then asked by defense counsel whether her daughter had ever related "anything that Mr. White caused any of those [bruises], to you?" Laws replied, "She always covered up for him. Always." During further cross-examination, Maxine Laws, in a nonresponsive answer, testified, "Mike had threatened [Debbie] with a gun. He had had a gun in his truck ... and she feared for her life."

Defense counsel, in an attempt to minimize the force of Laws' testimony concerning the incident in which White had pushed Debbie out of the truck, asked Laws: "The car [sic] was not moving when she got out of that vehicle, was it?" Laws responded to the question by stating that the vehicle had been moving, although not at a fast speed, and that the "door flew open." At that point, defense counsel inquired of the witness, "You do not know what led up to [the incident]?" Laws replied, "No sir. She did not go into detail, other than they had had a fuss and Mike had been drinking heavily. She went into detail that night that when Mike was drinking that he got very violent; and she said, that's the only time I have problems with Mike, mother, is he does get violent."

Following Maxine Laws' testimony, J.W. Laws, Bonnie Pike, Robert Pike, and Dennis Gray testified at the guilt-innocence phase—in that order.

J.W. Laws repeated the facts involving the truck incident, stating, according to his wife's statements to him, that Debbie had called and informed them that "she was hurt ... Mike had pushed her out of the truck and went off and left her...." Mr. Laws also testified that "Mike threatened to kill [Debbie's dog] if Debbie didn't get rid of him."

---

**3.** The objection was: "Your Honor, again we    object. This is completely hearsay."

Bonnie Pike testified that she had last seen Debbie alive on Saturday, April 18, 1987. On that day Bonnie Pike asked Debbie if she would go to church with her the following day, Easter Sunday. According to Pike, Debbie replied affirmatively and then turned and asked White "if he would go with her." Pike testified that White replied, "Goddam it, Debbie, you know that I've got to work tomorrow, hell I don't want to hear the shit."

Pike further testified that she had witnessed White use "force toward Debra" on "several different small incidents." She testified that the last incident had occurred while Debbie was "cutting somebody's hair." On that occasion, according to Pike, Debbie told her that White "pushed her down the porch steps because she asked him to wait so she could go swimming with him." Pike testified that on the same occasion Debbie had likewise commented to her: "I don't know why he acts like that, or why can't he love me more, why does he always have to be so hateful...."

When the prosecutor inquired of Pike, "What did Michael say to her that day?," Pike stated that White "used a bunch of foul language ... toward her." Pike then related an occurrence which took place while she and Debbie were riding in a car driven by White: White was

> trying to tell some story, ... and [Debbie] tried to volunteer some kind of information toward the story and [White] stomped the brake on and swerved over to the side and turned completely around (Debbie was sitting in the rear seat) and told her in foul language that if she didn't shut her mouth, her damned mouth that he would break both of her arms. I said, Mike, why would you want to do anything like that, and he said, shut your damn mouth or I'll break both of your arms too.

On the above-detailed occasion, according to Pike, all three parties had "been drinking."

Pike further testified that she had, on numerous instances, observed White "grab [Debbie] around the throat." Debbie had stated to her, Pike testified, that "she loved [White] more than life." Pike then recounted that on various different occasions White had, in her presence, "threatened to kill his wife." She recalled one specific instance—on January 3, 1986—in which White had warned Debbie that "he would break her damn neck." Pike additionally related that she had seen Debbie "with a black eye" and with "big bruises all down her legs ... arms ... [and] neck."

Robert Pike testified that he had seen and heard White verbally abuse Debbie on two or three different occasions, but had not witnessed White physically abuse Debbie. He testified that White had on one occasion made the following statement to him: "I ought to just kill [Debbie] and throw her in the Sabine River and collect the insurance money." Pike continued, however, by stating that he did not think White had made the threat seriously. Mr. Pike related that he found Debbie lying in the front yard of her mobile home after the shooting. According to Pike, she was still breathing at the time. He testified that he asked Debbie "what happened," to which she responded, "I tried to stop him, all I was doing was coming to Bonnie's."

Dennis Gray testified that he had never seen White strike Debbie. He had, however, heard White threaten her.

White testified in his own defense. He conceded that he and Debbie had arguments and "fights," but testified that he had never struck Debbie with the intention of hurting her. He also denied that he had pushed Debbie out of the truck during the incident to which Mrs. Laws had earlier testified. His version of that incident was instead as follows: Debbie was kicking him while both were in the truck; he lost control of the vehicle, which then "jumped the curb"; when the truck was stopped, Debbie got out and left; he searched for her without success, and finally left the scene. White denied that he had ever assaulted Debbie as testified to by the State witnesses.

White further testified that the shotgun had discharged accidentally while he and Debbie were struggling for control of the weapon.

In rebuttal, the State called three witnesses—Bonnie Pike, Kimberly Saul, and Barbara Williams. Bonnie Pike testified in rebuttal of the testimony of White's father. White's father had earlier testified that she (Bonnie Pike) had told him two days after the shooting that she had seen Debbie on the day of, but prior to, the shooting, and that "she had never seen Debbie any madder in her life before." During her rebuttal testimony Mrs. Pike denied having made the above-quoted statement to White's father, stating, "I did not see Debbie White, period, on April 19th." She admitted having spoken to White's father, but testified that the "story" which she had related to him concerned an incident which had transpired "[a]bout a *week* before her death...." (Emphasis added.) Such story, according to Mrs. Pike, was as follows: "[Debbie] came to my home upset and told me that they [White and Debbie] had left her parents' home and that Mike was intoxicated and was driving 75 and 80 miles an hour in a small Nissan pickup and that she feared for her life."

Saul testified with respect to the truck incident. He stated that White related to him that he and Debbie had been involved in an argument and that "he threw her out of the truck...." According to Saul's testimony, White further stated to him that he "didn't have any idea where [Debbie] was." At the time of this conversation, Saul related, "[White] looked like he had been out drinking."

Barbara Williams testified that her husband was a hunter, and had several deer heads and one elk head mounted on the wall of their home. On one occasion when Debbie viewed them, Williams testified, "she made the comment ..." to the witness and her husband that "I just hate them [the mounted heads] because a gun shot them."

The State's attorney discussed the truck incident in his opening argument at the guilt-innocence phase, and in his closing argument stated, "that man was abusive to [Debbie]...."

The threshold question in this appeal is: Was the "running" or "continuing" objection effective to preserve the claimed errors for appellate review? Neither the State nor the appellant addresses this issue. The State argues that the testimony complained of by White was admissible under the provisions of Tex. Penal Code Ann. § 19.06 (Vernon 1989). Alternatively, the State argues, the errors were harmless under *Jones v. State*, 587 S.W.2d 115 (Tex.Cr. App.1979), or the errors were waived or cured by reason of appellant's cross-examination which elicited virtually the same facts from the witnesses.[4] Additionally, the State argues that because White claimed that the shooting resulted from an accident, it was entitled to prove the extraneous offenses committed by White against the victim in order to show his state of mind, or intent, at the time of the shooting, citing *Albrecht v. State*, 486 S.W.2d 97 (Tex.Cr.App.1972).

Before we consider the State's arguments, we will discuss the nature, origin, and efficacy of the so-called "running" or "continuing" objection commonly utilized in Texas trial practice.

In Texas, the term "running" objection or "continuing" objection apparently arose as shorthand nomenclature for the traditional rule that a party whose objection to the admission of evidence is overruled need not repeat the objection when other similar evidence is offered by his adversary; the party may instead assume that the trial judge will make the same ruling on an identical subsequent objection. *See* McCormick On Evidence, § 52 at 132, n. 56 (Hornbook Series 3rd ed. 1984); R. Ray, Law Of Evidence, § 27 (3rd ed. 1980). Dean McCormick urges the advocate to secure the judge's permission for the "continuing" objection. The authors in both treatises recognize the soundness of that procedure, although McCormick does so more forcefully. *See* McCormick at 132.

Messrs. S. Goode, O. Wellborn, and M. Sharlot, in their 1988 GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 103.2 nn. 20 & 21 (Tex-

---

**4.** *See Sweeten v. State,* 693 S.W.2d 454, 456    (Tex.Cr.App.1985).

as Practice 1988), note that Texas courts have generally honored the "running objection" practice, citing, inter alia, *Welch v. Texas Employers' Insurance Association,* 636 S.W.2d 450, 453 (Tex.App.–Eastland 1982, writ ref'd n.r.e.), 643 S.W.2d 919 (Tex. 1982), and *Baldwin v. State,* 697 S.W.2d 725 (Tex.App.–Corpus Christi 1985, pet. ref'd). In addition, the writers express the opinion that the promulgation of Texas Rules of Criminal Evidence 103(a)(1)[5] did not in any way limit the effectiveness of the "running objection" in preserving error for appellate review, relying principally on works involving federal practice.[6]

Both *Welch* and *Baldwin* were decided before the effective date of Rule 103. A close reading of *Welch* reveals that, pursuant to Welch's motion in limine, the testimony by the TEIA witness was first elicited outside the jury's presence, whereupon the trial court overruled Welch's objection thereto. The same testimony was thereafter offered before the jury without further objection on the part of Welch. The Eastland Court simply held that in these circumstances the error was not waived, and that Welch was not required to repeat the objection before the jury in order to preserve the error for review.

In *Baldwin,* the State, in an aggravated sexual assault case, tendered the testimony of the victim regarding "the adverse effects on her life as a result of the sexual assault...." *Baldwin,* 697 S.W.2d at 732. The trial court overruled Baldwin's timely objection to the victim's testimony that she was afraid to return to the place of business from which she was abducted and thereafter sexually assaulted by a black man. After the witness testified to those facts, the prosecutor asked her "why....," whereupon defense counsel interrupted,

saying, "May we have a running objection as to this *line* of testimony as to anything that happened after the date of the offense concerning how it effected [sic] the witness[?]" (Emphasis added.) The Court overruled the objection, but stated, "[Y]ou shall have a running objection." Subsequently, similar testimony was elicited from the witness without objection. The Court of Appeals did not comment on the "running objection" permitted by the trial judge,[7] but simply overruled the point of error, concluding that the victim's testimony was relevant as tending to establish the element of lack of consent, and was thus admissible.

Our independent research reveals three recent appellate decisions[8] which discuss this trial practice. In *Goodman,* the court rejected a claim by the defendant that he had preserved error in the admission of testimony at the competency hearing by way of an objection *and* a "running objection." The objected-to testimony consisted of Goodman having told a State medical witness who had examined him for the purpose of determining his competency that he was charged with capital murder. The actual objection was:

> I object to that question because it calls for hearsay and further calls for matters that are a violation of [Goodman's] Fifth Amendment Rights and thirdly it calls for matters that are not relevant to ... his competency.

*Goodman,* 701 S.W.2d at 862.

The point on appeal stated that the testimony elicited over Goodman's objection constituted an "improper reference to the facts of the [capital murder] offense." *Id.* at 862–863. The Court of Criminal Appeals initially ruled that the point of error was not in accord with the objection made at

---

5. Reading:

   "*Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context." (Emphasis in original.)

6. Federal Rule of Evidence 103(a)(1) is identical to the Texas rule.

7. Apparently, no issue was raised by the State regarding preservation of the error.

8. *Goodman v. State,* 701 S.W.2d 850 (Tex.Cr. App.1985) (a capital murder case in which a competency hearing preceded the criminal trial); *Mares v. State,* 758 S.W.2d 932 (Tex.App.— El Paso 1988, no pet.); and *Killebrew v. State,* 746 S.W.2d 245 (Tex.App.—Texarkana 1987, pet. ref'd).

trial, and thus concluded that the error presented on appeal was not preserved for review. Following that conclusion, the Court rejected Goodman's argument that he had preserved the error by his "running objection to all questions concerning the offense, the nature of the offense, and everything related to the offense." *Id.* at 863. It would appear that the *Goodman* court's initial ruling appropriately disposed of such argument; the court, however, went on to state that Goodman had not cited, nor had the court found:

> any caselaw which supports the proposition that a 'running objection' will preserve error on a matter referred to by *any witness at any time* during a ... trial. Such a doctrine would certainly conflict with several cases which hold that error in admission of evidence is cured when the same evidence comes in elsewhere without objection, and that the defendant must object every time the alleged inadmissible evidence is offered. *See Brown v. State,* 640 S.W.2d 275 (Tex. Cr.App.1982); *Boles v. State,* 598 S.W.2d 274 (Tex.Cr.App.1980); *Crocker v. State,* 573 S.W.2d 190 (Tex.Cr.App.1978).

*Goodman,* 701 S.W.2d at 863 (emphasis ours).

The *Goodman* court then contingently ruled that, even if the error was preserved, it was harmless. *Id.*

The El Paso court in *Mares* simply reads *Goodman* as holding that "[a] 'running [objection]' does not preserve [error]." *Mares,* 758 S.W.2d at 933. The Texarkana court in *Killebrew,* on the other hand, adopted a more cautious view, finding *Goodman* as authority for the proposition that "[i]n most circumstances, a generalized 'running objection' will not preserve error." *Killebrew,* 746 S.W.2d at 247.

We have reviewed a number of older cases by the Texas Courts of Civil Appeals, as well as the recent decisions in *Goodman, Mares,* and *Killebrew,* with regard to the "running objection" practice.

From our study of Rule 103(a)(1), the case law, and the books alluded to herein,

we are persuaded, first, that *Goodman* did not wholly condemn the "running objection" practice which rests on sound policy. The "running objection" operates at trial to eliminate the needless delay involved in a party's repetition of objections to the admission of the same or similar evidence to which the same or similar objection has already been presented and overruled by the trial court. The "running objection" likewise protects the objecting party against prejudicing the trier of fact. It is apparent, however, from the dicta of *Goodman,* quoted on page 458 of this opinion, that the Court of Criminal Appeals has at least rendered a warning that a "running objection" will not preserve error in every case in which it is employed. Moreover, if Rule 103(a)(1) is but a codification of ruling case law, which it appears to be, then appellate courts must carefully review the record in each case in order to determine whether a "running objection" preserves the asserted error for appellate review. Summarily stated, such a determination depends upon the facts and circumstances in each case. *Goodman v. State; Killebrew v. State.*

■ The case before us presents what we believe to be an impermissibly extravagant application of the practice. White claims, in effect, that an objection made to the testimony of the first State witness, transformed into a running objection by permission [9] of the trial judge, is sufficient to preserve those errors committed by admitting the hearsay testimony of five other State witnesses who testified later in the trial. The initial hearsay objection, presented during Maxine Laws' testimony, was leveled against her declaration as to what Debbie had revealed to her about the truck incident of February, 1987. That objection was overruled. The prosecutor then posed the question, "Did she relate the conversation [between White and Debbie] to you that they had?[,]" at which point defense counsel asked the Court, "[C]an we reserve our objection to hearsay testimony and have a running objection to

---

**9.** Which permission we find to be essential to   the existence of the running objection.

it?" That request was granted by the Court.

Given our construction of *Goodman* and consequently Rule 103(a)(1), as applied to the facts and circumstances of this case, the running objection [10] was sufficient to preserve only other trial errors committed in the admission of hearsay testimony by Maxine Laws. Moreover, the running objection preserved for review errors which respected only extrajudicial statements made by Debbie to Maxine Laws or to others in Maxine Laws' presence. Any other interpretation would run contrary to the clear import of the unambiguous provisions of Rule 103(a)(1). *Goodman v. State*, 701 S.W.2d at 863.

Having so decided, we next consider whether the errors which are the proper subjects of the objection, and the running objection, have been waived by White. If they have not been so waived, we must then determine whether the errors are harmless under Tex.R.App.P. 81(b)(2). Our careful review of the record in this case, including the State's arguments, persuades us that White effectively waived the trial court's errors in admitting the inadmissible hearsay statements [11] of Maxine Laws. Such waiver arose as the result of White's failure to object to the hearsay testimony given by J.W. Laws, Bonnie Pike, Robert Pike, and Kimberly Saul concerning the same statements made by Debbie or statements made by White, with respect to the same or similar events. Moreover, if we be wrong in our conclusion that the errors were waived, we determine beyond a reasonable doubt from our review of the record that the errors made no contribution to White's conviction or to his punishment. Tex.R.App.P. 81(b)(2). The point of error is therefore overruled, and the judgment of conviction is affirmed.

---

**10.** That is, the objection actually made by White.

**11.** The statements were not admissible under Tex. Penal Code Ann. § 19.06 (Vernon 1989). *See Werner v. State*, 711 S.W.2d 639, 644 (Tex. Cr.App.1986).