COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH



NO. 2-09-242-CR

CHRISTOPHER WAYNE                                    APPELLANT
SCRANTON

V.

THE STATE OF TEXAS                                        STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

Gunmen breached the back door of an Arlington gaming establishment around closing time and stripped the cash from an elderly employee's wallet. Police captured Appellant Christopher Wayne Scranton a few hours later and presented him for a field show-up to an eyewitness who had tried to bar the door as the robbers broke in. Appellant now appeals his convictions on two counts of aggravated

---

[1] See Tex. R. App. P. 47.4.

robbery, contending that the pretrial field show-up was impermissibly suggestive and that the evidence is legally and factually insufficient. Because we hold the trial court did not abuse its discretion by denying Appellant's motion to suppress identification and because we hold the evidence is both legally and factually sufficient to support the jury's verdict, we affirm the trial court's judgment.

## II. Factual Background

Around midnight on May 10 going into May 11, 2008, Appellant parked his red F-150 pickup truck on the side of the Joy Game Room, a gaming establishment at the corner of South Collins and East Mayfield in Arlington.

Marcus Linton spent five days a week at the game room, sometimes helping out with odd jobs such as cleaning up and re-stocking the refrigerator. On May 10, he had been helping set up a security camera when around 2:00 a.m., closing time, he stepped out front to move the car he had borrowed to the alley in the back so that passers-by would not think that the business was still open while he stayed to play some of the machines after hours.

As he wheeled the car around to the alley, he passed near Appellant's red pickup truck backed up against the building. The truck's "dim" lights were on and two people were in the front seat: a black man sitting upright behind the steering wheel and someone else bent down in the passenger seat beside him.

Marcus thought it was "not normal" for a vehicle to be parked that way and on that side of the building at that time of night. As he passed the front of the truck, the

2

passenger's face was below his line of sight and the driver acted as though he wanted to avoid being noticed.

Marcus continued into the alley, parked behind the building, climbed out of the car, and tapped on the game room's back door. Someone let him in, and after stepping inside and locking the door behind him, he realized that he had left a friend's cell phone in the car. He turned to unlock the door, and when he set foot outside, he saw two people standing close by. He immediately retreated inside and tried to close the door when a pair of hands grabbed hold from the outside.

Riley Kemp was the manager in charge of the late shift. Standing in the doorway between the main and back areas, he turned from the customer he had been assisting to see Marcus struggling to close the back door.

Marcus had almost succeeded when another pair of hands from the outside grabbed the door. But Marcus released his grip when the muzzle of a handgun penetrated the opening and pressed against his forehead.

For a moment, Marcus locked eyes with the man holding the gun. Then, fearing that he was either going to be hurt or killed, Marcus stepped aside and two gunmen (the second armed with a shotgun) threw the door open and burst inside.

The intruders, bundled up in multiple layers and hooded sweats, trained their weapons at Marcus and Kyong Son, a seventy-year old employee who had been helping clean up, and ordered them face-down on the floor.

Watching from the main area of the game room, Riley called 911 and began quietly escorting the fifteen or so customers toward the front entrance and out of the building. As Riley talked with the 911 dispatcher, the men in the back realized that the keys to the money were evidently on the opposite side of the building with Riley at the front entrance. Frantically looking for something to steal, they kicked open the locked office door located in the back area. Finding nothing valuable there, one of the men snatched the wallet from Son's back pants pocket, stripped it of its sixty dollars in cash, and stuffed it back in Son's pants. Then they made for the back door, slammed it shut, and dashed through the alley.

Riley hurried to the back, opened the door, and instructed Marcus to see if he could tell where the men went. Marcus took off running down the alley.

The robbers barreled north along the wooden privacy fence that extended behind the game room toward Mayfield Street. Marcus followed on the opposite sidewalk as they circled back onto Mayhill Court and continued south down that street, disappearing through an open gate between two houses at the end of the cul-de-sac. Within seconds, a patrol car pulled up to Marcus, who climbed in and collapsed onto the backseat.

Another patrol car stopped at the end of the cul-de-sac, and Officer Robert Muguerza climbed out and entered the backyard where the robbers had disappeared. He spotted two suspects in the large open field across the fence.

4

They ran west, crossing Collins and a church parking lot before vanishing into the adjoining neighborhood.

The officer who had picked up Marcus returned him to the game room, asking on the way whether Marcus would be able to recognize the robbers if he saw them again. Marcus replied that he would "because that's all I remembered was the face."

In the game room parking lot, officers ran a license check of the red pick-up truck backed up against the building; it was registered to Appellant.

The police set up a containment perimeter encircling several blocks around the game room. Officer Frank Smith had taken a position northwest of the game room when he heard that a suspect had been seen running northbound on Collins. He headed that way and picked up Lehman Mintor running northbound on the west side of the street.

The officer took Lehman to the game room parking lot and presented him to Marcus for a field show-up. Illuminated by bright lights and wearing handcuffs behind his back, he stood approximately twenty yards from Marcus, who was hidden behind the lights. Marcus could not identify him.

In the meantime, Officer Muguerza and his police dog had relocated to Shea Court, just to the west of the church grounds where the suspects had last been seen. The dog sniffed out Eddie Beasley, who was barefoot, wearing only a T-shirt and shorts, hiding in a flower bed. Officers took Eddie into custody and transported him to the game room parking lot where he was presented to Marcus in the same

5

manner that Lehman had been a half hour before. Marcus immediately recognized him as one of the robbers.

After Lehman had been cleared for release, Officer Smith was taking him south on Collins when he saw another suspect in a white T-shirt and jeans running northbound through the church grounds from the wooded area where Eddie Beasley had been tracked. Officer Smith radioed the suspect's position and description, dropped off Lehman, and took up a position on the south perimeter.

A 911 caller reported seeing someone running and crouching behind fences in a neighborhood to the northwest of the game room. Officer Smith drove to that location and saw the same suspect he had seen running on Collins—now without a shirt and with his jeans ripped—coming out of a backyard at 408 Thomas Lane. Officer Smith cruised up from the rear with his lights off. When the suspect noticed the patrol car, he started jogging. Pulling up alongside, Officer Smith asked him what he was doing, to which he replied that he was going for his "morning jog." When the suspect identified himself as Appellant, Officer Smith recognized the name from the license-plate check of the pickup truck at the game room. Officer Smith ordered Appellant into the patrol car and transported him to the game room parking lot where he was presented to Marcus for a field show-up in the same manner as Lehman Mintor and Eddie Beasley had been before. Marcus immediately and unequivocally identified Appellant as the gunman with whom he had earlier locked eyes at the back door of the game room.

6

Crime scene investigators discovered a .45 caliber handgun and a sawed off .410 shotgun in the field behind the fence where Marcus had chased the robbers. Inside the fence, officers also found several articles of clothing, including hooded jackets and gloves. Subsequent DNA testing of the clothing matched some of the articles to Eddie Beasley and some to Appellant.

A jury convicted Appellant on two counts of aggravated robbery. Appellant pleaded true to habitual-offender paragraphs alleging prior convictions for robbery and aggravated robbery. The trial court assessed Appellant's punishment at fifty years' confinement on each count, ordering the sentences to run concurrently.

### III. Sufficiency of the Evidence

In his second issue, Appellant challenges the legal and factual sufficiency of the evidence. He does not dispute that the evidence shows the commission of an aggravated robbery, but he contends that the evidence is insufficient to show that he committed it.

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[2]

---

[2] *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

7

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party.[3] We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust.[4] To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, although legally sufficient, contradicts the verdict.[5]

Unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence."[6] Evidence is always factually sufficient when it preponderates in favor of the conviction.[7]

Viewed in the light most favorable to the verdict, the evidence presented in this case is legally sufficient to support the jury's implied finding expressed in its verdicts

---

[3] *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).

[4] *Steadman*, 280 S.W.3d at 246; *Watson*, 204 S.W.3d at 414–15, 417.

[5] *Watson*, 204 S.W.3d at 417.

[6] *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000); *see Steadman*, 280 S.W.3d at 246.

[7] *Steadman*, 280 S.W.3d at 247; *see Watson*, 204 S.W.3d at 417.

that Appellant was one of the robbers. Appellant's vehicle was parked at the robbery location before, during, and after the robbery; his DNA was detected on clothes dumped into a backyard along the robbers' escape route; two weapons matching the descriptions of those used in the robbery were found on the other side of the fence; a police officer observed Appellant running in a white T-shirt and jeans from an area where the robbers were last seen and subsequently found him emerging from a backyard without the T-shirt and with his jeans ripped; Appellant had been walking up to the time that he noticed the patrol car behind him, but then feigned jogging when he saw he was being followed; and an eyewitness who tried to keep the door closed against the robbers' entry and who testified that he looked into Appellant's eyes when Appellant held a gun to his forehead positively identified Appellant as one of the robbers. We overrule this part of Appellant's second issue.

In support of his claim that the evidence is factually insufficient to show that he was one of the robbers, Appellant argues that the field show-up procedure was unreliable because Marcus was high on drugs and even if he was sober, it is doubtful that his view of the assailants was sufficient to identify him in a line-up. He also suggests that Marcus's identification of Appellant as one of the robbers was tainted by Marcus's motivation to catch the robbers because he felt guilty for letting them in and because the police pressured him to make an identification. Finally, he asserts that he parked beside the game room within walking distance of his girlfriend's home to avoid having his truck repossessed. Viewed in a neutral light,

9

however, we find nothing in the record suggesting that the jury's resolution of these issues of weight and credibility resulted in verdicts that were clearly wrong or manifestly unjust. Nor do we find that the evidence supporting the verdict is particularly weak or that it is outweighed by any evidence that conflicts with the verdict. We overrule this part of Appellant's second issue.

## IV. The Field Show-up

In his first issue, Appellant claims that the trial court abused its discretion when it denied his motion to suppress evidence that Marcus positively identified him as one of the robbers. The State responds that Appellant failed to preserve this issue for our review.

Although the State acknowledges that the trial court granted Appellant a running objection out of the presence of the jury on "the identity issue," the State argues that because Appellant requested his running objection during the testimony of one witness, he was required to re-urge his objection when the same evidence came in during the testimony of another. In other words, the State argues, his running objection applied to only one witness, specifically, to the testimony of Officer Stevens on the issue of Marcus's identification of Appellant as one of the robbers and not to Marcus's testimony, which was presented later in the trial and which Appellant did not specifically object to. The State contends that when Marcus later testified to having identified Appellant as one of the robbers, Appellant was required

to raise another objection to preserve any error in the admission of his testimony about Marcus having identified Appellant.

In support of its position, the State cites two cases from the court of criminal appeals, *Sattiewhite v. State*[8] and *Goodman v. State*,[9] and two cases from our sister courts in Austin and Tyler, *Scaggs v. State*[10] and *White v. State*,[11] respectively. In addition, the State cites *Ford v. State*,[12] a more recent case, which it candidly acknowledges cuts against its position.

Also citing *Ford*, commentators have noted that "[a] properly framed running objection can extend to testimony by all witnesses pertaining to the same type of evidence."[13] In *Ford*, when the decedent's mother was called to testify, the appellant stated, "Your Honor, I would ask that my running objection extend to all witnesses, if they testify to the same type of matter."[14] The trial court responded, "All right. I note your objection. I'll grant your running objection on this issue and overrule it."[15]

---

[8] 786 S.W.2d 271 (Tex. Crim. App. 1989), *cert. denied*, 498 U.S. 881 (1990).

[9] 701 S.W.2d 850 (Tex. Crim. App. 1985).

[10] 18 S.W.3d 277 (Tex. App.—Austin 2000, pet. ref'd).

[11] 784 S.W.2d 453 (Tex. App.—Tyler 1989, pet. ref'd).

[12] 919 S.W.2d 107 (Tex. Crim. App. 1996).

[13] 1 Steven Goode et al., *Texas Practice: Guide to the Texas Rules of Evidence* § 103.2 (3d ed. 2002) (citing *Ford*, 919 S.W.2d at 113).

[14] *Ford*, 919 S.W.2d at 113.

[15] *Id*.

On appeal, the *Ford* court held that the appellant had preserved his claim for review:

"        The record reflects that appellant was clearly objecting 'to any and all impact evidence' as 'to all witnesses' testifying to such. The trial court clearly understood such complaint and ruled adversely thereon. We conclude that appellant has preserved his claim for review."[16]

The record in this case shows that outside the jury's presence, Appellant specifically objected to "any testimony regarding [Marcus's] identification of [Appellant]" and the trial court granted a running objection "as to the identity issue."

> MR. SCOTT [for Appellant]: Your Honor, at this time I would make a motion that *any* eyewitness identification in regards to Mr. Scranton be suppressed. I think the show-up lineup or the show-up that was done that night was highly prejudicial. It's going to be suggestive to Mr. Linton. And I don't think that much probative value can be had. I think it's more highly prejudicial to the defendant. I think there's better ways they could have done some type of identification.
>
> And I don't think that there should be *any* testimony regarding Mr. Linton's identification of Mr. Scranton due to the high probability of suggestive nature of the show-up lineup. I mean, one, he was in handcuffs; two, he had already identified a previous person; and, three, I don't think that he has sufficient options in which to decide whether or not this was one of the suspects.
>
> THE COURT: Let me ask one question. He had also failed to identify one person that you brought in as a suspect that you used the same procedure to show; is that correct?
>
> THE WITNESS: Yes, Your Honor.

---

[16] *Id.* at 113–14; *see also George v. State*, 959 S.W.2d 378, 384 (Tex. App.—Beaumont 1998, pet. ref'd).

THE COURT: Actually, there were three people that you showed him out there that night?

THE WITNESS: Yes, sir.

THE COURT: Okay. All right. I'm going to overrule your objection.

MR. SCOTT: And I would like a running objection as to ––

THE COURT: That's fine. You can have your objection as to the identity issue.

MR. SCOTT: Thank you, Your Honor.

THE COURT: Bring in the jury. [Emphasis added.]

We think it clear from the record that Appellant properly framed his running objection and that the trial court granted it to apply to all witnesses testifying on Marcus's eye-witness identification of Appellant. Accordingly, we hold that Appellant has preserved his claim for review.[17]

The State also argues that Appellant failed to preserve his claim because although he argued to the trial court that the identification procedure was suggestive, he did not argue that it was impermissibly so nor did he argue that the procedure led to his mistaken identification by the witness.

Although there are no technical considerations or forms of words required to preserve an error for appeal, a party must be specific enough so as to "let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly

---

[17] *See Ford*, 919 S.W.2d at 113–14; *George*, 959 S.W.2d at 384.

enough for the judge to understand him at a time when the trial court is in a proper position to do something about it."[18] A general or imprecise objection is sufficient to preserve error only if the legal basis for the objection is obvious to the trial court and opposing counsel.[19] Whether the specific grounds for the objection were apparent from the context of the objection is determined by looking at each situation individually as it arises.[20]

Our review of the discussion between Appellant and the trial court set out in the record leads us to conclude that the trial court clearly understood the basis for Appellant's objection.[21] Therefore, we shall address the merits of Appellant's complaint.

---

[18] *Resendez v. State*, 306 S.W.3d 308, 312–13 (Tex. Crim. App. 2009) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)).

[19] *Buchanan v. State,* 207 S.W.3d 772, 775 (Tex. Crim. App. 2006).

[20] *Heidelberg v. State*, 144 S.W.3d 535, 538 (Tex. Crim. App. 2004); *see also Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009) (holding that error was preserved because "[a]fter receiving a copy of *DeLarue* and hearing [a]ppellant's argument, the trial judge should have been aware of the basis of the objection")*; Rivas v. State*, 275 S.W.3d 880, 887 (Tex. Crim. App. 2009) (holding that an objection is not defective merely because it does not identify a rule of evidence); *Clarke v. State*, 270 S.W.3d 573, 580, 583 (Tex. Crim. App. 2008) (holding error preserved when claim on appeal was same essential claim made to the trial court, just "gussied . . . up with legal authority").

[21] *See Lankston*, 827 S.W.2d at 909.

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review.[22] We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor.[23]

A pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law.[24]

Whether an identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification is a mixed question of law and fact that does not turn on an evaluation of credibility and demeanor.[25] Accordingly, we apply a de novo standard of review.

To determine the admissibility of an out-of-court identification, we ask, considering the totality of the circumstances, (1) whether the identification procedure

---

[22] *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[23] *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

[24] *Simmons v. United States,* 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968); *Barley v. State,* 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995), *cert. denied*, 516 U.S. 1176 (1996).

[25] *Loserth v. State,* 963 S.W.2d 770, 772–73 (Tex. Crim. App. 1998); *Page v. State*, 125 S.W.3d 640, 646 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

was impermissibly suggestive and, if so, (2) whether the improperly suggestive procedure created a very substantial likelihood of irreparable misidentification.[26] Suggestiveness may arise from the manner in which an identification procedure is conducted.[27] For example, we have previously noted that although a one-man field show-up does not in and of itself violate due process, from a practical perspective it does carry with it a degree of suggestiveness.[28] On the other hand, it also allows the police to quickly release a person who has been seized but is not the perpetrator.[29] But the question we must ask here is not whether a show-up procedure carried with it a degree of suggestiveness, it is whether the show-up was *impermissibly* suggestive. A defendant bears the burden of establishing by clear and convincing evidence that the pretrial identification procedure was impermissibly suggestive.[30] If we find that it is, we then must decide whether the impermissibly suggestive procedure led to a very substantial likelihood of irreparable misidentification.[31]

---

[26] *Simmons,* 390 U.S. at 384, 88 S.Ct. at 971; *Barley,* 906 S.W.2d at 33.

[27] *Barley,* 906 S.W.2d at 33.

[28] *Stewart v. State*, 198 S.W.3d 60, 63 (Tex. App.—Fort Worth 2006, no pet.).

[29] *Id.*

[30] *Barley,* 906 S.W.2d at 33–34.

[31] *See id.*; *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App.), *cert. denied*, 510 U.S. 982 (1993).

16

Appellant asserts that the field show-up in this case was impermissibly suggestive because (1) Marcus identified only the suspects that were in handcuffs whereas he did not identify the suspect that was not in handcuffs and (2) the police pressured Marcus to positively identify a suspect making him feel that they would not take "no" for an answer.

Our review of the record, however, shows that the identification procedure employed by the police in this case was not impermissibly suggestive. The police officer who presented Lehman Mintor—the suspect whom Marcus could not identify and whom the police subsequently released—could not remember whether Lehman was in handcuffs during the show-up. Marcus, on the other hand, testified that he looked at a number of suspects that night and that they *all* were handcuffed. Further, our review of the record does not support Appellant's contention that the police unduly pressured Marcus to positively identify anyone or that they would not take "no" for an answer. In fact, Marcus specifically testified that the police "asked me to see if I recognized –– if I recognized this person as being one of the two," and that he did not feel that they put any pressure on him to identify anyone. Accordingly, we hold that the field show up was not impermissibly suggestive. Because of our disposition of this issue, we need not address whether the procedure led to a substantial likelihood of misidentification. We overrule appellant's first issue.

## V. Conclusion

Having overruled both of Appellant's issues, we affirm the judgment.


PER CURIAM

PANEL:  DAUPHINOT, MCCOY, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  July 8, 2010